Accordingly, the summary judgment under review is affirmed.

603 A.2d 983

BELLE LIEBERMAN, PLAINTIFF–RESPONDENT, v. THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, A BODY CORPORATE AND POLITIC, DEFENDANT–APPELLANT, AND CHARLES SHEROD, THIRD–PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Submitted January 27, 1992—Decided March 5, 1992.

Before Judges PETRELLA, R.S. COHEN and ARNOLD M. STEIN.

*Hugh H. Welsh,* attorney for appellant (*Hugh H. Welsh,* of counsel; *Donald F. Burke,* on the briefs).

*Krumholz Horn Shechtman Hirsch,* attorneys for respondent (*Alan L. Krumholz,* on the brief).

No other parties participated in this appeal.

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

The Port Authority of New York and New Jersey (Port Authority) appeals, on leave granted, from the denial of its motion to dismiss the complaint filed by Belle Lieberman as well as the denial of its motion for reconsideration. It argues on appeal that there is no cause of action against it for enhanced risk to commuters due to the presence of persons who are not customers or business invitees in the Port Authority Bus Terminal (Bus Terminal) in New York City.

The incident which gave rise to this law suit occurred about 8:10 a.m. on February 1, 1989 when Lieberman was walking out of a bakery at the Bus Terminal. She was knocked to the ground by third-party defendant Charles Sherod who stole her pocketbook. A Port Authority police officer immediately apprehended and arrested Sherod.

Lieberman, a North Bergen, New Jersey resident, filed her complaint on January 22, 1990, alleging that the Port Authority breached a duty it owed to her by permitting persons who are neither customers nor business invitees to occupy and sometimes inhabit portions of the Bus Terminal, thereby exposing others to increased risk of danger. Her complaint also contended that the Port Authority failed to provide adequate police protection.

On October 29, 1990, Lieberman's attorney served the Port Authority with a notice to produce documents from January 1980 to January 1990 pertaining to crime statistics and problems with so-called homeless people. The Port Authority objected to the production of the documents as overbroad. It also questioned the relevancy of deposition testimony plaintiff sought to use from another lawsuit of testimony of an employee in charge of a project to develop a policy and strategy for dealing with the presence of homeless persons in its public facilities. However, it did not object to the use of that deposition.

In February 1991, the Port Authority moved to dismiss the complaint for failure to state a cause of action. The motion was denied by an order entered on May 7, 1991 for reasons set forth in a letter opinion of the same date. The motion judge held the Port Authority to the same standard of care as a private or commercial entity and ruled that it could be held liable for injuries to invitees from foreseeable criminal acts of third parties. He relied in large part on the consent to suit provision of *N.J.S.A.* 32:1-162, as well as the fact that the Port Authority has its own police force. The judge concluded the Port Authority "is subject to liability for the negligent omissions of any precautions which reasonably prudent law enforcement officer could take." Reconsideration was denied.

█ The motion judge relied on *Goldberg v. Housing Authority of Newark*, 38 *N.J.* 578, 186 *A.2d* 291 (1962), which had declined to hold that the housing authority had a duty to provide police protection to tenants of its housing project. The judge distinguished the instant case by stating that unlike the residential project in *Goldberg*, the Port Authority has its own police force, and thus it owes a duty to provide police protection to invitees. We reject that conclusion. Merely because the Port Authority maintains its own police force does not expose it to liability for failure to provide police protection. *See Bizien v. Port Authority of States of New York and New Jersey*, 577 *F.Supp.* 1093 (E.D.N.Y.1983).

The Port Authority is a bi-state agency created by interstate compact between New Jersey and New York and is designated "a body corporate and politic" by legislation enacted in the respective states. *N.J.S.A.* 32:1-4; *N.Y. Unconsol. Laws* § 6604 (McKinney 1979). *See Port Authority of New York and New Jersey v. Ingram*, 232 *N.J.Super.* 401, 404, 557 *A.2d* 337 (App.Div.1989). It is a governmental agency of both states and is engaged in the performance of essential governmental functions. *See Mineo v. Port Authority of New York and New Jersey*, 779 *F.2d* 939 (3d Cir.1985), *rehearing denied*, 783

F.2d 42 (3rd Cir.1986), *cert. denied,* 478 *U.S.* 1005, 92 *L.Ed.*2d 712, 106 *S.Ct.* 3297 (1986); *Trippe v. Port of New York Authority,* 14 *N.Y.*2d 119, 249 *N.Y.S.*2d 409, 198 *N.E.*2d 585 (1964); *Port of New York Authority v. J.E. Linde Paper Co.,* 205 *Misc.* 110, 127 *N.Y.S.*2d 155 (Municipal Court 1953); *Port of New York Authority v. City of Newark,* 17 *N.J.Super.* 328, 331, 85 *A.*2d 815 (Chan.Div.1952). The legislation which authorized the Port Authority to undertake construction, operation and maintenance of the Bus Terminal expressly provides that the Port Authority "shall be regarded as performing an *essential governmental function* in undertaking the construction, maintenance and operation" of the Bus Terminal. *N.J.S.A.* 32:2–23.3; *N.Y. Unconsol. Laws* § 6703 (McKinney 1979).

Traditionally, the Port Authority was cloaked with sovereign immunity as an instrumentality of the two states. However, in 1951, both states abrogated this immunity. *See N.J.S.A.* 32:1–157 *et seq.; N.Y. Unconsol. Laws* § 7101 [*et seq.*] (McKinney 1979). *See also N.J.S.A.* 32:1–162 and *N.Y. Unconsol. Laws* § 7106 (McKinney 1979) ("... Although the Port Authority is engaged in the performance of governmental functions, the said two States consent to liability on the part of the Port Authority in such suits, actions or proceedings for tortious acts committed by it and its agents to the same extent as though it were a private corporation.").

■ Notwithstanding this limited consent to suit, the common law doctrine of immunity to provide police protection was not waived. The common law rule that a governmental agency, acting in its governmental capacity, cannot be liable for failure to provide adequate police protection remains unless the injured party establishes a special relationship.[1] *See Crosland v. New*

---

[1] The Port Authority cites *Weiss v. Fote,* 7 *N.Y.*2d 579, 200 *N.Y.S.*2d 409, 167 *N.E.*2d 63 (1960), in which the court discusses section 8 of the *Court of Claims Act* which states:

The State hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance

*York City Transit Authority,* 68 *N.Y.*2d 165, 506 *N.Y.S.*2d 670, 498 *N.E.*2d 143 (1986); *Miller v. State,* 62 *N.Y.*2d 506, 478 *N.Y.S.*2d 829, 467 *N.E.*2d 493 (1984); *Weiner v. Metropolitan Transportation Authority,* 55 *N.Y.*2d 175, 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124 (1982). See also Annotation, *Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection,* 46 *A.L.R.*3d 1084, 1087–1088 (1972) (Issue of immunity and that of liability are separate and distinct. When a State consents to be sued, it "does nothing more than waive its immunity from action; it does not create a cause of action where none previously existed."). The fact that the Port Authority maintains and operates its own police force does not change the result. *Bizien v. Port Authority of States of New York and New Jersey, supra,* 577 *F.Supp.* 1093. New York decisions are persuasive here because the Port Authority is a bi-state agency and "it is eminently desirable ... that the path of judicial decision in the courts of the two States be a common one." *Moonachie v. Port of New York Authority,* 38 *N.J.* 414, 425, 185 *A.*2d 207 (1962). Thus, decisions of the courts of New York [2] are to be considered as "highly influential precedent." *Ibid.* In light of this, and because the parties do not argue choice of law issues we need not pause to consider

---

with the same rules of law as applied to actions in the supreme court against individuals or corporations.

The court construed the above language to mean that the State shall be treated as an individual or corporation in respect of its legal status. It does not "place the State on a parity with private corporations or individuals in respect of all of its defenses." *Id.* at 414, 167 *N.E.*2d at 66. The court concluded that the waiver provision was not intended "to override the well-defined and carefully reasoned body of law" governing the State's liability. *Id.* at 415, 167 *N.E.*2d at 67.

The Port Authority urges this same interpretation regarding the waiver of immunity provision in *N.J.S.A.* 32:1–162.

2New Jersey cases relied on by the Port Authority which were decided under the Tort Claims Act are not helpful because the Port Authority is not subject to that act. *Port Authority of New York v. Ingram,* 232 *N.J.Super.* 401, 404, 557 *A.*2d 337 (App.Div.1989).

conflict of law principles. *See Veazey v. Doremus;* 103 *N.J.* 244, 510 *A.*2d 1187 (1986).

■ Plaintiff attempts to frame her claim against the Port Authority as a failure of a landlord/building operator or common carrier to provide a reasonably safe terminal for invitees. She argues that her claim is not based on a failure to provide police protection. We reject this argument and conclude that based on the specific act or omission out of which the injury arises, the activities for which plaintiff seeks to hold the Port Authority liable involve and stem directly from a failure to allocate police resources.

*Weiner v. Metropolitan Transportation Authority,* 55 *N.Y.*2d 175, 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124 (1982), presented consolidated cases in which the plaintiffs had been attacked as each had entered a subway station. The allegation was that the Transit Authority, acting in its proprietary capacity, owed a duty of reasonable care to protect passengers from the foreseeable criminal acts of a third party, and that this duty was coextensive with that owed to a passenger by a private common carrier or property owner. Complaint reports of the transit police had established that during a nine-month period, nine attacks had occurred at the station in question.

The New York Court of Appeals held that the activities for which the plaintiffs sought to hold the Transit Authority liable "involve or grow directly out of the failure to allocate police resources." 448 *N.Y.S.*2d at 144, 433 *N.E.*2d at 127. The court iterated the rule that absent a special relationship, a governmental entity will not be held liable for failure to provide adequate police protection or allocation of police resources. *Ibid.*

On the issue of the subway constituting a proprietary activity, the Court stated:

It is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in

proprietary activity or is in control of the location in which the injury occurred. [*Id.* at 144, 433 *N.E.*2d at 127].

The Court also said:

> The New York City Transit Authority *owes no duty to protect a person on its premises from assault by a third person, absent facts establishing a special relationship between the authority and the person assaulted.* That a nongovernmental common carrier would be liable under the same factual circumstances is not determinative of the authority's liability. Its immunity from such liability rests upon the same considerations as does the immunity of a municipality or other governmental body from liability for failure to provide adequate police protection, for the duty if one were recognized would necessarily implicate the Transit Authority police. [*Id.* at 142, 433 *N.E.*2d at 125 (emphasis added)].

This language was subsequently interpreted to be a broad protection premised on the theory that if a governmental entity were required to utilize non-police measures to protect individuals from the criminal acts of third parties, these measures might stretch its resources as much as providing police protection. *See Giamboi v. New York City Transit Authority,* 124 *Misc.*2d 810, 811–812, 479 *N.Y.S.*2d 929, 930–931 (Sup.Ct.App. Term.1984) (Transit Authority not liable for injuries sustained by plaintiff hit with bottle thrown from subway platform as she waited at a bus stop below, despite notice of prior similar incidents. To require it to install high fences at subway overpasses could prove more expensive than stationing police at the locations.); *Ammirati v. New York City Transit Authority,* 117 *Misc.*2d 213, 457 *N.Y.S.*2d 738 (Sup.Ct.1983) (disapproved by *Crosland v. New York City Transit Authority, supra,* 506 *N.Y.S.*2d at 672, 498 *N.E.*2d at 145 "to the extent [that] it misapplies the *Weiner* Test"). The plaintiff in *Ammirati,* who was injured by a rock thrown through the window of a subway car, alleged that the Transit Authority was negligent in failing to install shatterproof glass on its subway trains. The Transit Authority was held not liable. The court stated that obligating the Transit Authority to install shatterproof glass on its trains might prove to be more burdensome than requiring it to post a transit officer at certain locations. 457 *N.Y.S.*2d at 742.

Plaintiff relies upon *Eisman v. Port Authority Trans Hudson Corp.*, 96 *Misc.*2d 678, 409 *N.Y.S.*2d 578 (Sup.Ct.Sp.Term 1978), a trial court case decided before *Weiner*, in which Eisman alleged that PATH's failure to maintain a safe, secure and adequately protected commuter railroad station caused her to be criminally assaulted and raped. On a motion to dismiss the court held that since the Port Authority had installed surveillance equipment at the location of the alleged incident, Eisman could possibly demonstrate that this equipment was installed to provide passenger security, thus imposing a duty or special relationship to plaintiff. 409 *N.Y.S.*2d at 581. As noted, existence of a special relationship is an exception to the general rule that a governmental entity is immune from liability for failure to provide adequate police protection.

Plaintiff cites other New York cases which have held either the State or a governmental agency liable for injuries sustained by criminal acts of third-parties on either a common carrier or private landlord liability theory. Thus, in *Miller v. State of New York*, 62 *N.Y.*2d 506, 478 *N.Y.S.*2d 829, 467 *N.E.*2d 493 (1984), the State was held liable as a landlord for damages sustained by plaintiff as a result of being raped in a dormitory at a State university. The plaintiff in *Miller* asserted two theories of negligence liability. The first was that the State failed to provide adequate police protection.[3] The second was that since the State was acting in a proprietary capacity as a landlord, it had breached its duty to protect its tenants from reasonably foreseeable criminal assaults by failing to lock the outer doors of the dormitory. *Id.* 478 *N.Y.S.*2d at 831, 467 *N.E.*2d at 495. The lower court dismissed plaintiff's complaint, "characterizing the claim as sounding solely in inadequate police protection." *Id.* at 832, 467 *N.E.*2d at 496.

---

[3]On appeal, plaintiff abandoned this theory acknowledging the long line of cases which hold that public entities are immune from liability for failure to provide adequate police protection unless a special relationship is established.

In reversing, the Court of Appeals in *Miller* cited a line of cases which held that "when the State acts in a proprietary capacity as a landlord, it is subject to the same principles of tort law as is a private landlord." *Id.* at 832, 467 *N.E.*2d at 496. However, the Court noted the difficulty that arises when the State acts in the dual role of proprietary landlord and governmental capacity by providing police protection through establishment of a campus police department [or as in the case at hand by providing its own Port Authority police force]. The Court stated:

A governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection. Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State's alleged negligent action falls into, either a proprietary or governmental category. [478 *N.Y.S.*2d at 832, 467 *N.E.*2d at 496].

*Citing Riss v. City of New York*, 22 *N.Y.*2d 579, 293 *N.Y.S.*2d 897, 240 *N.E.*2d 860 (1968) and *Bass v. City of New York*, 38 *A.D.*2d 407, 330 *N.Y.S.*2d 569 (N.Y.App.Div.1972), *aff'd*, 32 *N.Y.*2d 894, 346 *N.Y.S.*2d 814, 300 *N.E.*2d 154 (1973), the *Miller* Court noted that in order to determine the extent of the State's liability as a landlord, it had to distinguish between those governmental activities which have replaced or supplemented traditionally private enterprises but are performed by the State in a proprietary capacity, from those which have always been deemed governmental in nature. 478 *N.Y.S.*2d at 832, 467 *N.E.*2d at 496.

*Miller* applied these principles, as well as the holding in *Weiner, supra;* it is the specific act or omission out of which the injury arises which governs liability, not whether the entity is engaged in a proprietary activity or is in control of the premises. *Miller* noted that ownership and the care of build-

ings with tenants has traditionally been carried out by private enterprises such as landlords. The specific act complained of there was the failure of the State University to lock the outer doors of the dormitory. Thus, *Miller* held the State to the same standard as a private landlord with a duty to maintain minimal security measures, *i.e.*, keeping dormitory doors locked, in the face of foreseeable criminal intrusion upon tenants:

As a relatively restricted action, having locked doors falls within the scope of the State's proprietary function as a landlord. *This is not to say that further security measures relating to a particular dormitory or the entire campus might not be located so far along the continuum as to be beyond the scope of the State's duty as a landlord and constitute actions undertaken in its police protection capacity.* [*Id.* at 833 (emphasis added)].

Subsequently, in *Rubino v. City of New York*, 114 *A.D.*2d 243, 498 *N.Y.S.*2d 831 (App.Div.1986), it was held that the Board of Education of the City of New York was liable under *Miller's* holding for injuries sustained by a teacher in the school yard who was struck by debris thrown from a neighboring apartment building. Liability existed because the facts fell within the continuum of responsibilities referred to in *Miller*. The Board had failed to provide plaintiff with even minimal information regarding the frequency of these events. Allocation of police resources was not involved.

In the case before us, Lieberman's argument is that the Port Authority should be liable under the theories of landlord liability for the injuries she sustained. The Port Authority does not dispute that private landlords owe a duty to protect tenants from foreseeable criminal acts of third parties, *Nallan v. Helmsley–Spear, Inc.*, 50 *N.Y.*2d 507, 429 *N.Y.S.*2d 606, 407 *N.E.*2d 451 (1980); *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 445 *A.*2d 1141 (1982). Rather, it asserts that under *Weiner*, *supra*, 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124, as a governmental entity it owed no duty to provide police protection.

While plaintiff's complaint alleges that the Port Authority was negligent in failing to provide a reasonably safe place for plaintiff and other business invitees, and despite her contention

that there are other measures which could have been taken to provide a safe terminal,[4] in actuality the activities for which she seeks to impose liability involve and grow directly out of the failure to allocate police resources.

Plaintiff refers us to several newspaper articles which were not part of the record below, which detail crime rate statistics for 1989 through 1991 for the Bus Terminal and her brief purports to narrate a typical trip through the Bus Terminal for the daily commuter. She recognizes that these articles are not properly within the record on appeal, *see* S. Pressler, *Current N.J. Court Rules*, R. 2:5-4 Comment (1992), but urges us to take judicial notice of the prevalence of crime and the large number of homeless persons who congregate within the Bus Terminal. We find it unnecessary to do so.

Whether or not homeless persons frequent the Bus Terminal as well as other buildings operated by the Port Authority, the issue of the Port Authority's duty to provide a reasonably safe terminal for commuters using its facility translates to its ability to allocate police resources. Unlike the facts in *Miller, supra,* 478 *N.Y.S.*2d 829, 467 *N.E.*2d 493, the Port Authority cannot lock the doors of the Bus Terminal in order to keep out possible criminals. This case falls on the outer limits of the continuum of responsibility, and involves "complex measures of safety and security for a greater area and populace," thereby fully implicating a governmental function of allocating police resources. 478 *N.Y.S.*2d at 832, 467 *N.E.*2d at 496. Even under *Miller,* the "security" measures urged by plaintiff are so far along the spectrum as to be beyond the scope of the Port Authority's

---

[4]The remedies which plaintiff suggests are available to reduce the risk of harm to commuters include utilizing the joint efforts of social services agencies in encouraging the homeless to leave the bus terminal, preventing actual habitation in the terminal, the use of multiple signs, posters, music, lights, mirrors, patrols by Port Authority non-uniformed employees and the establishment of alternative sites (presumably for the homeless).

duty as a landlord and thus would constitute actions in its police protection capacity. *See Id.* at 833, 467 *N.E.*2d at 497.

If the Port Authority were required to utilize "non-police" measures to protect commuters from the criminal acts of third parties, such measures might diminish its resources, which are in effect public funds, as much as providing police protection. *See Giamboi v. New York City Transit Authority, supra* (479 *N.Y.S.*2d at 930). The language in *Riss v. City of New York, supra,* 293 *N.Y.S.*2d 897, 240 *N.E.*2d 860, in the context of an allegation of failure to provide police protection, is instructive:

The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits.

> \*     \*     \*     \*     \*     \*     \*     \*

When one considers the greatly increased amount of crime committed throughout the cities, but especially in certain portions of them, with a repetitive and predictable pattern, it is easy to see the consequences of fixing municipal liability upon a showing of probable need for and request for protection. To be sure these are grave problems at the present time, exciting high priority activity on the part of the national, State and local governments, to which the answers are neither simple, known, or presently within reasonable controls. To foist a presumed cure for these problems by judicial innovation of a new kind of liability in tort would be foolhardy indeed and an assumption of judicial wisdom and power not possessed by the courts. [*Id.* at 898–899, 240 *N.E.*2d at 860–861].

Other cases cited by plaintiff offer little or no support since either the particular jurisdiction does not have a doctrine of immunity for failure to provide police protection, *Kenny v. Southeastern Penn. Transp.,* 581 *F.*2d 351 (3rd Cir.1978); *Magaw v. Mass. Bay Transp. Authority,* 21 *Mass.App.* 129, 485 *N.E.*2d 695 (1985); *Haynes v. Chicago Transit Authority,* 59 *Ill.App.*3d 997, 17 *Ill.Dec.* 534, 376 *N.E.*2d 680 (1978), or liability was imposed because employees of the agency were already present on the scene and failed to provide even minimal aid, *Lopez v. Southern California Rapid Transit,* 40 *Cal.*3d 780,

221 *Cal.Rptr.* 840, 710 *P.*2d 907 (1985); *McCoy v. Chicago Transit Authority,* 69 *Ill.*2d 280, 13 *Ill.Dec.* 690, 371 *N.E.*2d 625 (1977); *Mangini v. Southeastern Pennsylvania Transp. Authority,* 235 *Pa.Super.* 478, 344 *A.*2d 621 (1975).

Plaintiff also argues that the Port Authority should be liable for her injuries because it failed to meet the standard of care owed by a common carrier to its passengers. She contends that the Port Authority ought to be held to the standard of care owed by common carriers even if the Port Authority itself is not considered a common carrier. She maintains that it performs the vital connecting role of the carriers, and is in reality, both the successor to the carriers in the operation of depots and terminals, and their designated agent in carrying out a function previously performed by the common carrier.

In *Crosland v. New York City Transit Authority, supra,* 506 *N.Y.S.*2d 670, 498 *N.E.*2d 143, the issue was whether a public carrier should be immune from civil liability when its employees allegedly stood by and did nothing while one of its passengers was beaten to death in the subway station. *Id.* at 670, 498 *N.E.*2d 143. The Court of Appeals held that the failure of the employees who saw the attack to summon aid was outside of the boundaries of the policy-based governmental immunity established in *Weiner, supra,* 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124. The court weighed the extent that its decision might expose the Transit Authority to burdensome liability against other policies: namely, compensation for injury or loss of life, general deterrence, and the failure of the Transit Authority to insure that its employees observe "common standards of behavior."

The case before us is clearly distinguishable from *Crosland.* Plaintiff does not allege that one of the Port Authority's employees failed to come to her aid. Nor does she contend that an employee of the Port Authority stood idly by and watched her being attacked. In fact, the Port Authority Police quickly

apprehended the assailant. The Port Authority did not breach any standard of common or expected behavior.

Reversed and remanded for entry of an order dismissing the complaint with prejudice.