622 A.2d 1295

BELLE LIEBERMAN, PLAINTIFF–APPELLANT, v. THE PORT AU-
THORITY OF NEW YORK AND NEW JERSEY, A BODY COR-
PORATE AND POLITIC, DEFENDANT–RESPONDENT, AND
CHARLES SHEROD, THIRD–PARTY DEFENDANT.

Argued January 4, 1993—Decided April 14, 1993.

*Alan L. Krumholz* argued the cause for appellant (*Krumholz, Horn, Shechtman, Hirsch*, attorneys).

*Hugh H. Welsh* argued the cause for respondent (*Mr. Welsh*, attorney; *Donald F. Burke*, on the brief).

*Alexander P. Waugh, Jr.*, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo*, Attorney General, attorney; *Sarah E. Fitzpatrick*, Deputy Attorney General, on the letter brief).

*Thomas S. Higgins* submitted a brief on behalf of *amicus curiae* Delaware River Port Authority (*Higgins, Slachetka & Long*, attorneys; *Mr. Higgins, Howard C. Long, Jr.*, and *Peter J. Bonfiglio, III*, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

We granted certification, 130 *N.J.* 14, 611 *A.*2d 652 (1992), to review the Appellate Division's determination that plaintiff's complaint did not state a cause of action against the Port Authority of New York and New Jersey ("Port Authority"). Plaintiff seeks recovery from the Port Authority for injuries she sustained when she was robbed and injured by a homeless man in the Port Authority Bus Terminal in New York City

("Terminal"). The trial court denied the Port Authority's motion to dismiss, holding that because the Port Authority had its own police force, it was liable for failure to provide adequate police protection. The Appellate Division reversed and held that the activities for which plaintiff sought to hold the Port Authority liable stemmed directly from its failure to allocate police resources. 254 *N.J.Super.* 456, 603 *A.*2d 983 (1992). Because New York and New Jersey law preclude recovery for failure to provide police protection absent a special relationship, the Appellate Division dismissed plaintiff's complaint.

■■■ Courts should approach motions to dismiss for failure to state a cause of action pursuant to *Rule* 4:6–2(e) with caution. Because such motions are usually brought at the earliest stages of litigation, they should be granted in "only the rarest instances." *Printing Mart v. Sharp Elecs.*, 116 *N.J.* 739, 772, 563 *A.*2d 31 (1989). In deciding whether to dismiss a complaint for failure to state a cause of action, courts should search the complaint

> "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." At this preliminary stage of the litigation the Court [should not be] concerned with the ability of plaintiff[ ] to prove the allegation contained in the complaint. [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegation of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.

[*Id.* at 746, 563 *A.*2d 31 (quoting *Di Cristofaro v. Laurel Grove Memorial Park*, 43 *N.J.Super.* 244, 252, 128 *A.*2d 281 (App.Div. 1957)) (citations omitted).]

Applying those principles, we conclude that plaintiff's complaint states a cause of action. Although the Appellate Division correctly ruled that plaintiff may not maintain a cause of action for the Port Authority's failure to provide police protection, plaintiff's complaint, read broadly, also alleges a claim that the Port Authority, in its capacity as a landlord, negligently failed to take reasonable non-police-protection security mea-

sures to make the Terminal a reasonably safe place for commuters and other invitees.

I

On February 1, 1989, at 8:10 a.m., Charles Sherod, a homeless man, knocked down plaintiff, Belle Lieberman, and stole her purse as she walked out of Zaro's Bakery in the Terminal. Immediately thereafter, a Port Authority police officer arrested Sherod. Plaintiff, a sixty-six-year-old commuter from North Bergen, New Jersey, sustained a compression fracture of the lower back and sprained her wrist and shoulder.

On January 22, 1990, plaintiff filed an action against the defendants, Port Authority of New York and New Jersey and the perpetrator, Charles Sherod,[1] seeking damages for the assault. In her complaint plaintiff made the following claims: that defendant had a duty to exercise reasonable care to provide a reasonably safe place for business invitees and travellers; that defendant had permitted homeless people to inhabit the premises even though they were not business invitees, and even though they "represented a threat and hazard"; and that defendant continuously had failed to provide adequate police protection and security measures for the safety of its business customers and travellers.

On October 29, 1990, plaintiff sent defendant a Notice to Produce, among other things, ten years' worth of crime statistics and reports of the Port Authority's plans regarding the homeless. On June 17, 1991, the trial court granted an order requiring defendant to comply with the Notice to Produce and allowing the use of an employee's deposition taken in another Port Authority action regarding the homeless; however, to date, plaintiff has not been provided with any discovery.

---

[1] Sherod has never appeared in the action and the record contains no evidence that he was ever served. Therefore, all references to "defendant" will refer to the Authority.

Defendant denied liability and moved to dismiss plaintiff's complaint for failure to state a cause of action. The trial court, in an unpublished letter opinion, held that the Port Authority "is subject to liability for the negligent omissions of any precautions which a reasonably prudent law enforcement officer could take." Although the court found that the Port Authority owes a duty of care to invitees, it did not elaborate on the scope of due care required. Rejecting the Port Authority's claim of governmental immunity, the court called defendant a "grand landlord" that is "subject to the same liability as any other property owner." The court denied a motion for reconsideration.

The Appellate Division reversed. That court rejected plaintiff's attempts to frame her claim as a failure of a landlord or common carrier to provide reasonably safe premises for invitees. Although plaintiff stressed that the failure to provide adequate police protection was only *one* of her causes of action, the Appellate Division, like defendant, focused solely on that issue. The court held that the Port Authority's maintenance of a police force did not automatically subject it to liability for failure to provide police protection, and that absent a special relationship, plaintiff had no cause of action. 254 *N.J.Super.* at 460, 603 *A*.2d 983.

We granted plaintiff's petition for certification, 130 *N.J.* 14, 611 *A*.2d 652 (1992), and now reverse because the Appellate Division erroneously construed plaintiff's complaint as one alleging only a failure to provide police protection. We hold that plaintiff's complaint, when read generously, states a cause of action.

## II

The Port Authority controls Newark, Teterboro, Kennedy, and LaGuardia Airports; two heliports; seven marine terminals; three industrial parks; the World Trade Center; the PATH train system; the Lincoln and Holland Tunnels; the

Bayonne, Goethals, and George Washington Bridges; the Outerbridge Crossing; and the Terminal.

In 1921, New York and New Jersey signed a compact establishing the Port Authority as a joint and common agency of the two states. *N.J.S.A.* § 32:1–1 (West 1992); *N.Y.Unconsol.Laws* § 6401 (McKinney 1992). The legislatures of the two states maintain control of the Port Authority, and in 1946 authorized construction of the Terminal for "the accommodation of buses and other motor vehicles operated by carriers engaged in the transportation of passengers for the loading, unloading, interchange or transfer of such passengers or their baggage, or otherwise for the accommodation, use or convenience of such passengers or such carriers or their employees." *N.J.S.A.* § 32:2–23.1; *N.Y.Unconsol.Laws* § 6701. The Act further provided that

> [t]he establishment, maintenance and operation of such motor bus terminal within the Port of New York district is and will be in all respects for the benefit of the people of the States of New Jersey and New York, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; *and the Port Authority shall be regarded as performing an essential governmental function in undertaking the construction, maintenance and operation thereof and in carrying out the provisions of law relating thereto.*

[*N.J.S.A.* § 32:2–23.3; *N.Y.Unconsol.Laws* § 6704 (emphasis added).]

Although the Port Authority serves a governmental function, it is not immune from suit. In 1951, the Port Authority statutorily consented to suit, and thus it is not subject to the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3. *Williams v. National Car Rental Sys. Inc.,* 225 *N.J.Super.* 164, 168, 541 *A.*2d 1125 (Law Div.1988) ("The broad powers conferred upon the Port Authority leave no doubt that it is a * * * public [entity]. Even so it is clear that the Tort Claims Act does not apply * * *.").

The statute providing consent to liability states in relevant part:

> Although the Port Authority is engaged in the performance of governmental functions, the said two States consent to liability on the part of the Port Authority in such suits, actions or proceedings for tortious acts committed by it and its agents *to the same extent as though it were a private corporation.*
> [*N.J.S.A.* § 32:1–162; *N.Y.Unconsol.Laws* § 7106 ("consent statute") (emphasis added).]

The legislative history provides no indication of the scope of the consent to suit; however, the language permitting suits as though the Port Authority were a private corporation is broader in scope than that used for many other agencies. Many statutes give agencies the power to "sue and be sued." See, *e.g.*, *N.J.S.A.* 32:3–5 (West 1992) (Delaware River Port Authority); *N.J.S.A.* 27:23–5(d) (West 1992) (New Jersey Turnpike Authority); *N.J.S.A.* 27:12B–5(d) (West 1992) (New Jersey Highway Authority); *N.J.S.A.* 32:23–10 (West 1992) (Waterfront and Airport Commission of New York and New Jersey); and *N.J.S.A.* 27:25–5 (West 1992) (New Jersey Transit Corporation).

Since 1956 we have interpreted the consent language "sue and be sued" broadly to allow plaintiffs to sue public authorities for their negligence in conducting proprietary actions. In *Taylor v. New Jersey Highway Auth.*, 22 *N.J.* 454, 126 *A.*2d 313 (1956), we held that a guest of a tenant who had sustained an injury from a fall in a multi-family dwelling could sue the Authority for its negligence because the Authority had been in actual control and possession of the premises and hence subject to suit. Implicit in our analysis was the fact that the scope of suit for more commercial governmental entities is different from that for governmental agencies acting in a more public capacity.

Construing the statute that established the Palisades Interstate Park, another bi-state agency, we stated that "[t]here is little reason to doubt that when the New Jersey Legislature approved the sue and be sued clause in the compact it meant to waive sovereign immunity and to authorize suits against the Commission generally." *Interstate Wrecking Co. v. Palisades Interstate Park Comm'n.*, 57 *N.J.* 342, 346, 273 *A.*2d 10 (1971). In reaching that conclusion we cited several United States

Supreme Court decisions that "held that sue and be sued clauses in various congressional enactments creating federal independent agencies amounted to waivers of governmental immunity and consents to suit in actions sounding *in tort as well as contract.*" *Id.* at 347, 273 *A.*2d 10 (emphasis added).

The legislatures of the two states could have chosen to grant the Port Authority the ability and liability to "sue and be sued;" however, they chose not to do so. Instead they adopted the even broader language of *N.J.S.A.* 32:1–162. Therefore, although we are mindful of the governmental nature of many of the Port Authority's functions, we conclude that its amenability to suit in the exercise of non-governmental functions is broader than that of agencies authorized only to "sue and be sued."

### III

The Port Authority is a jointly-created agency of both New York and New Jersey. The parties have cited the case law of both jurisdictions to support their positions. In choice-of-law disputes, both New York and New Jersey have rejected the traditional "conflict" rules, which automatically choose the law of the place of the wrong. Instead, they have adopted a more flexible approach that looks to the law of the jurisdiction having the most significant contacts with the occurrence and the parties. *Veazey v. Doremus,* 103 *N.J.* 244, 247–248, 510 *A.*2d 1187 (1986); *Rose v. Port of New York Auth.,* 61 *N.J.* 129, 140, 293 *A.*2d 371 (1972); *Babcock v. Jackson,* 12 *N.Y.*2d 473, 240 *N.Y.S.*2d 743, 191 *N.E.*2d 279 (N.Y.1963).

Because plaintiff is a New Jersey resident, this State, rather than New York, has the more significant interest. Nonetheless, although we are not bound by New York law, we deem it to be influential precedent because of the bi-state nature of the Port Authority.

## IV

■ We first dispose of plaintiff's claim that defendant, as owner of the Terminal, is a common carrier and hence subject to an enhanced duty of care to its customers. New Jersey has a long history of imposing liability on common carriers for failure to provide adequate security. Although New Jersey has no statutory provision mandating that common carriers use a "high duty of care," as many other states do, our courts have consistently imposed that standard. *See Ricci v. American Airlines*, 226 *N.J.Super.* 377, 544 *A.*2d 428 (App.Div.1988) (noting that the duty to protect patrons is high); *Melicharek v. Hill Bus Co.*, 70 *N.J.Super.* 150, 175 *A.*2d 238 (App.Div.1961) (stating that if carrier has reasonable cause to know of likelihood of injury to a passenger and danger is preventable by exercise of due care, carrier is liable); *Sandler v. Hudson & Manhattan R.R. Co.*, 8 *N.J.Misc.* 537, 151 *A.* 99, *aff'd*, 108 *N.J.L.* 203, 156 *A.* 459 (E. & A.1931) (holding carrier liable when one passenger pushed another between the train and platform because carrier had duty to protect against known dangers); *Exton v. Central R.R. Co.*, 62 *N.J.L.* 7, 42 *A.* 486 (Sup.Ct.1898), *aff'd o.b.*, 63 *N.J.L.* 356, 46 *A.* 1099 (E. & A.1899) (finding carrier liable because of knowledge of criminal propensities of men loitering around station).

Plaintiff argues, without citing any authority, that even if the Port Authority itself is not a common carrier, it performs the role of connecting carriers and thus should be subject to the same high duty of care in protecting its passengers. However, not only is there no case law establishing the Port Authority as a common carrier, the statutory definition of "common carrier" would preclude such a designation. Under *N.J.S.A.* § 27:1A–65(b)

"carrier" means any individual, co-partnership, association, corporation, joint stock company, public agency, trustee or receiver operating motor buses or rail passenger service on established routes within this State or between points in this State and points in adjacent states.

Although the Port Authority Trans–Hudson ("PATH") train system, also controlled by defendant, meets the definition of a "common carrier," the Port Authority Bus Terminal, which serves among other things as a bus depot, is not a "common carrier" under any accepted definition. Therefore, plaintiff cannot hold the Port Authority to the high standard of care imposed on common carriers for an assault that occurred in the Terminal.

## V

Under the laws of both New Jersey and New York, plaintiff also cannot hold defendant liable for its failure to provide adequate police protection. The consent statute merely eliminated the defense of sovereign immunity. Therefore, because no liability existed at common law for failure to provide police protection for governmental entities, we will not impose such liability now.

Although the Port Authority is not within the purview of New Jersey's Tort Claims Act, which immunizes municipalities from claims alleging inadequate police protection, *N.J.S.A.* § 59:5–4, the common law traditionally provided immunity. In 1962, this Court held that a municipal housing authority had no duty to provide police protection after assailants had beaten and robbed a milk deliveryman in an elevator. *Goldberg v. Housing Auth.*, 38 *N.J.* 578, 186 *A.2d* 291 (1962). We did acknowledge, however, that owners of private businesses have a duty to protect their guests from the predictable behavior of other guests, *id.* at 584, 186 *A.2d* 291, and that a landlord, including a governmental agency acting as a landlord, could be liable if it failed to secure property placed within its control or if it carelessly allowed criminals to enter the premises. *Id.* at 588, 186 *A.2d* 291.

In 1971, we again decided that plaintiffs cannot hold a municipality responsible for failure to provide police protection. *A & B Auto Stores v. City of Newark*, 59 *N.J.* 5, 279 *A.2d* 693.

After the 1967 Newark riots, thousands of business owners sued the City for damages, claiming that the City had handled the disturbances in a negligent manner. The Court, interpreting the Riot Control Act, reasoned that

> The barrier [to liability] is not a technical doctrine of governmental immunity from suit, but rather the absence of a substantive basis for imposing liability. This is so because ultimately plaintiffs challenge administrative or legislative decisions of a discretionary character, and it would be intolerable to burden those decisions with a dollar liability whenever a trier of the facts disagrees with them.

[*Id.* at 11, 279 *A.*2d 693.]

Plaintiff urges the Court to consider two cases that have imposed liability for failure to provide police protection. Those cases, however, are easily distinguishable from the present case. In both cases, the plaintiffs alleged that the defendants were liable for failure to take adequate security measures, not for failure to provide police protection. In *McGlynn v. Newark Parking Authority*, 86 *N.J.* 551, 432 *A.*2d 99 (1981), this Court held a municipal parking garage liable for vandalism of a car in its parking garage, explaining that

> [i]n the present cases, the Authority knew of prior incidents of vandalism; the Authority also controlled access to the parked cars. The prior incidents of vandalism indicated the foreseeability of the risk that criminal acts of others would cause harm to the automobiles and their contents. This foreseeable risk of harm extended not only to the parked cars, but to all items that the garage owner would reasonably expect to find within the cars.

[*Id.* at 560, 432 *A.*2d 99.]

In *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 445 *A.*2d 1141 (1982), an assailant knocked a grocery store patron to the ground in the parking lot and stole her purse. The injured patron alleged that the store had negligently failed to warn of potential criminal dangers and had failed to provide a safe place in which to shop. The Court noted that seven muggings had occurred on the premises within a year, with five of them in the five months preceding the attack on the plaintiff. The store had hired off-duty police officers as security guards, but at the

time of the mugging, the guard on duty was inside the store. We held in *Butler* that a business proprietor owes a duty to safeguard business invitees and to make the premises reasonably safe. *Id.* at 275, 445 *A.*2d 1141.

In both *McGlynn* and *Butler,* we found that foreseeability of criminal acts was the crucial factor, and that the trier of fact should determine whether the business owner had exercised reasonable care in its performance of its duty to safeguard business invitees from criminal acts.

Plaintiff argues that the principles of foreseeability and liability for criminal acts committed against business invitees should apply to commuters who use the Terminal. She maintains that because the Port Authority operates shops and serves as a connector between companies that transport business commuters, it should be subject to landlord liability, without regard to its governmental characteristics.

Unlike the parking garage in *McGlynn* or the private store in *Butler,* the Port Authority serves a dual role, and we cannot ignore the constraints that its governmental functions impose on its liability. New Jersey has not abandoned the principle that immunizes public entities from actions alleging failure to provide police protection. Therefore, the Appellate Division properly dismissed plaintiff's cause of action based on the Port Authority's failure to provide adequate police protection.

New York law likewise supports that conclusion. In New York, plaintiffs have no cause of action against municipal entities for their failure to provide police protection, absent a "special relationship." Plaintiff alleges no such "special relationship."

In 1982, New York's highest court ruled definitively that governmental transit authorities have no duty to provide adequate police protection. *Weiner v. Metropolitan Transit Auth.,* 55 *N.Y.*2d 175, 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124. The Court of Appeals held that the New York City Transit Authority owes no duty to protect a person on its premises from assaults by third persons, absent a special relationship. In

*Weiner*, a man accosted a woman on the steps of a subway station, slashed her purse strap, and cut her wrist. During a ten-month period preceding the attack, thirteen other people had been robbed or assaulted at the same station, with nine of the attacks occurring at the same location. *Id.* 448 *N.Y.S.*2d at 143, 433 *N.E.*2d at 126.

The Court rejected the reasoning that the Transit Authority's governmental nature rendered it immune, although the court agreed that it was not liable, explaining:

It is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred.

The activities for which it is sought to hold the authority * * * involve or grow directly out of the failure to allocate police resources—the absence of police surveillance at the entrance and the failure to warn of criminal activity in the area or close the entrance when police protection was not available. That the police and the common carrier activity (otherwise proprietary) are vested in the same entity will not lessen the crushing nature of the burden that would otherwise be imposed nor interfere less with the legislative-executive decision how to utilize such resources.

[*Id.* 448 *N.Y.S.*2d at 144, 433 *N.E.*2d at 127 (citations omitted).]

In 1986, the Court of Appeals clarified the *Weiner* decision and indicated that cases would arise in which the City *would* be liable for the criminal acts of third persons. *Crosland v. New York City Transit Auth.*, 68 *N.Y.*2d 165, 506 *N.Y.S.*2d 670, 498 *N.E.*2d 143 (1986). In *Crosland* a group of teens beat to death a student from the High School of Music at a train station after a late night concert. The court found that the Transit Authority could be liable if the plaintiff could prove that the Authority's employees had watched the beating from a position of safety but had not summoned aid. Further, it explained that

*Weiner* did not * * * absolve publicly owned common carriers from liability for assaults on their passengers by third parties in all cases. Rather, the court noted "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability."

\*        \*        \*        \*        \*        \*        \*        \*

Watching someone being beaten from a vantage point offering both safety and the means to summon help without danger is within the narrow range of circumstances which could be found to be actionable.

[*Id.* 506 *N.Y.S.*2d at 672, 498 *N.E.*2d at 145 (quoting *Weiner, supra,* 448 *N.Y.S.*2d at 144, 433 *N.E.*2d at 127).]

More importantly, the *Crosland* court explicitly rejected the argument that exposing the Transit Authority to liability would be too burdensome financially. Instead, the court found it more important to balance the cost with the policies of general deterrence and compensation for the victim.

■ We find the reasoning in *Weiner* and *Crosland* persuasive; however, we also note that important differences exist between the New York City Transit Authority and the Port Authority. First, although both serve to assist commuters in getting to their destinations, the Port Authority does much more. Not only does it operate a bus depot at the Terminal, but it also rents space to shops, businesses, and restaurants.

Second, the Transit Authority has the capacity to "sue and be sued," *New York City Transit,* § 1204, while plaintiffs can sue the Port Authority as though it were a "private corporation." Therefore, the immunity conferred on the Transit Authority for its governmental function is more protective than the broad scope of liability given to the Port Authority. *Supra* at 84, 622 *A.*2d at 1299. Accordingly, the burdens and duties of the two Authorities are not completely analogous.

## VI

Although the courts of both states have held that governmental entities are not liable for failure to provide adequate police protection, they have held such entities liable under general negligence principles for injuries caused by foreseeable acts of third persons. *See, e.g. Mayer v. Housing Auth.,* 84 *N.J.Super.* 411, 202 *A.*2d 439 (App.Div.1964), *aff'd o.b.,* 44 *N.J.* 567, 210 *A.*2d 617 (1965) (holding municipal landlord liable when tenant's child was injured after being struck in eye by rock thrown in playground because landlords were on notice about frequency of such incidents and therefore could reasonably foresee incident); *Jackson v. Hankinson,* 51 *N.J.* 230, 235, 238

*A.*2d 685 (1968) (stating "municipal entities, along with all others, should justly be held accountable for injuries resulting from their tortious acts and omissions of ordinary principles of negligence, except as a matter of policy, in situations involving so-called discretionary determinations and the like").[2] Even the *Goldberg* case, which declined to hold a housing authority liable for failure to provide police protection, acknowledged that the proprietary nature of a public entity may govern its liability as though it were a private enterprise. *Goldberg, supra,* 38 *N.J.* at 581, 186 *A.*2d 291.

Therefore, although our courts have declined to hold municipal entities responsible for failure to provide police protection, we have chosen to impose liability when those entities have engaged in non-governmental activities and when they have breached their duties of due care—even when those breaches involve injury to a party by a third person—as long as that injury is reasonably foreseeable.

In *Miller v. State,* 62 *N.Y.*2d 506, 478 *N.Y.S.*2d 829, 467 *N.E.*2d 493 (1984), the New York Court of Appeals adopted a standard similar to that we imposed on public entities in New Jersey. Because the Port Authority has both governmental and landlord duties, we find that standard to be more applicable to this situation than the *Weiner* standard. In *Miller,* a trespasser raped a woman in a state university dormitory. The assailant entered the dormitory through an unlocked door and used other unlocked doors to transport the plaintiff to other parts of the building. The plaintiff and other students had previously put the campus administration on notice about the unlocked doors and the incidence of crime on campus by non-residents.

The trial court, like the Appellate Division in this case, dismissed the plaintiff's claim, "characterizing the claim as

---

[2] Although both *Mayer* and *Jackson* are pre-Tort Claims Act cases, they aptly illustrate the common-law attitude toward governmental immunity in cases concerning non-governmental activities.

sounding solely in inadequate police protection." 478 *N.Y.S.*2d at 832, 467 *N.E.*2d at 496. In reversing, the Court of Appeals cited a long line of cases that held that it was "not disputed that when the State acts in a proprietary capacity as a landlord, it is subject to the same principles of tort law as is a private landlord." *Ibid.* It then acknowledged a difficulty that we face in the case at hand, namely, the dual role that defendant has as both a governmental entity and a landlord. After explaining the dilemma, the court established the following framework:

> A governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection. Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State's alleged negligent action falls into, either a proprietary or governmental category.

> [*Ibid.*]

Applying that test, the court held that locking dormitory doors falls within the State's function as a landlord. Nevertheless, the court held that further security measures relating to the entire campus might fall closer to the governmental end of the spectrum, reaching into the sphere of police-protection activity.

Hence, like the New Jersey courts, New York courts have acknowledged that when a governmental entity acts as a landowner or landlord, it is subject to the same tort liability as a private enterprise.

## VII

In a sense, the Port Authority is different from almost every other governmental entity. It has a dual character. It oper-

ates a bus depot to facilitate commuter travel between the states; thus, it performs a governmental function. On the other hand, it acts as a private enterprise, renting space to stores, businesses, restaurants, and private transportation companies, which pay for the convenience of the Terminal's central location. The two States have endowed the Port Authority with many governmental powers and responsibilities; yet, it has many of the same duties as landlords of large shopping malls.

Because of the Port Authority's dual character, each situation is fact-sensitive and turns on the act in question. A continuum such as that expressed in *Miller* is helpful. Applying that approach to the extremes of the Port Authority's governmental and proprietary functions in the Terminal is not difficult. The more difficult problem arises in applying the rule in less certain situations. Because of its dual role, we stress that any cause of action brought against the Port Authority must involve an extremely fact-sensitive inquiry into the injury alleged, the remedy requested, and the role (either governmental or as a landlord) that the Port Authority played at the time of the alleged injury.

In this case, we find that plaintiff has alleged more than a mere failure to provide police protection. Another claim can be gleaned from plaintiff's complaint, namely, that the Port Authority has failed to provide reasonably safe premises for its invitees. Contrary to defendant's claim, that duty does not automatically translate into the duty to provide greater police protection. Rather, the inquiry is directed to whether the Port Authority as the landlord of the Terminal had the duty to provide better lighting, signs, security cameras, and other measures to increase commuter safety.

The trier of fact must consider the Port Authority's duty in the context of its governmental activities. The trier of fact must also be sure that plaintiff's claim for failure to provide reasonably safe premises is not a disguised claim for failure to provide police protection. Although some suggested security

measures might fall in the realm of landlord responsibility, others could encroach on the governmental-decisionmaking powers of the Port Authority. For example, providing better lighting and signs appear to fall closer to the landlord end than to the governmental end of the spectrum. Providing security cameras, closing off deserted areas of the building, and establishing measures for crowd control might fall closer to the middle of the spectrum.

Requiring the Port Authority to eject the homeless or to conduct some social-service intervention is closer to the governmental end of the spectrum, and an injured plaintiff cannot interfere with those types of decisions. The Port Authority, as a governmental entity, is not free to eject those whom it believes might have criminal propensities merely because they are loitering, without violating the civil liberties of the homeless. *See People v. Bright*, 71 *N.Y.*2d 376, 526 *N.Y.S.*2d 66, 72, 520 *N.E.*2d 1355, 1361 (1988) (invalidating loitering statute and stating Port Authority is not a facility of restricted public access but a place so public as to "invite conduct that could be construed as loitering"). Therefore, claims questioning the Port Authority's management of the homeless must fail if they involve legislative or governmental decisions.

We are aware that the Port Authority is a governmental agency and thus subject to financial constraints. The Port Authority contends that as a public entity entrusted with public funds, it is not as free as profit-making enterprises to raise prices to defray costs. Therefore, it argues, this Court should not subject it to the same liability as a private corporation. We reject that argument. We recently held in *Bligen v. Jersey City Housing Auth.*, 131 *N.J.* 124, 619 *A.*2d 575 (1993), that we would not relieve a housing authority of liability for failure to provide safe premises simply because statutes precluded it from raising rents. Similarly, we will not relieve the Port Authority of its responsibility as a landlord to provide reasonably-safe premises, despite its status as a public entity.

In sum, because the Port Authority has consented to suit as though it were a private corporation and has acted as a landlord in its operation of the Terminal, it is subject to the same liability as a private landlord, as long as the failure alleged does not concern police protection or any other primarily-governmental function. We do not decide where on the continuum the Port Authority's conduct in this case falls. We conclude, however, that plaintiff's complaint states a cause of action in alleging that the Port Authority, in its capacity as a landlord,. may have negligently failed to provide reasonably safe premises for its invitees.

We emphasize that our holding is a limited one. We do not hold that the Port Authority breached its duty to plaintiff or that, as the facts unfold during discovery and at trial, plaintiff's entire complaint may not be construed as seeking damages only for inadequate police protection. We simply hold that when plaintiff's complaint is read with a "generous and hospitable approach," *Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.*2d 31 it has alleged more than a failure to provide police protection. Accordingly, the Appellate Division erred in dismissing plaintiff's complaint for failure to state a cause of action. We therefore reverse the judgment below and remand to the trial court to permit the case to proceed in accordance with the guidelines established herein.

*For reversal and remandment*—Chief Justice WILENTZ and Justices GARIBALDI, CLIFFORD, HANDLER, POLLOCK, O'HERN, and STEIN—7.

*Opposed*—None.