Matter of World Trade Ctr. Bombing Litig. (2004 NY Slip Op 24030)

Matter of World Trade Ctr. Bombing Litig.

2004 NY Slip Op 24030 [3 Misc 3d 440]

January 20, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Friday, July 9, 2004

[*1]
In the Matter of World Trade Center Bombing Litigation.
Supreme Court, New York County, January 20, 2004

APPEARANCES OF COUNSEL

Milton H. Pachter (Gerald S. Crowley, Carlene V. McIntyre, Kathleen M. Collins, Dave D. Hood and Arnold D. Kolikoff of counsel), and Mendez & Mount, LLP (Gerald R. Drasheff and Wendy B. Millman of counsel), for Port Authority of New York and New Jersey, defendant. Davis Wright Tremaine, LLP (Victor A. Kovner, Sharon L. Schneier, Edward J. Davis and Peter Karanjia of counsel), Paul, Weiss, Rifkind, Wharton & Garrison (Brad S. Karp, Steven C. Herzog and Susanna M. Buergel of counsel), Fensterstock & Partners LLP (Blair C. Fensterstock and Ashley Pressler of counsel), Cozen O'Connor (Richard Glazer and Gerard F. Belz, Jr., of counsel), Parker & Waichman (Jerrold S. Parker and Herbert L. Waichman of counsel), Rheingold, Valet & Rheingold, P.C. (Terrence E. McCartney of counsel), Sullivan, Papain, Block, McGrath & Cannavo (Cyrus M. Diamond of counsel), and Fuchsberg & Fuchsberg (Abraham Fuchsberg, Irwin Berg and Ari Michael Gross of counsel), for plaintiffs. Louis Mangone, New York City, for Linda P. Nash, plaintiff. Gennet, Kallmann, Antin & Robinson, P.C., New York City (Stanley W. Kallmann of counsel), for Lumbermens Mutual Casualty Company, plaintiff.

{**3 Misc 3d at 442} OPINION OF THE COURT

Stanley L. Sklar, J.
Defendant the Port Authority of New York and New Jersey moves for summary judgment dismissing plaintiffs' negligence claims.
This action primarily involves the negligence claims of individuals and businesses that assert various injuries resulting from the bombing of the World Trade Center in 1993. It joins more than 175 cases, which have been consolidated for trial, discovery, and motions. Most of the plaintiffs are represented by a Steering Committee, but several have retained separate counsel.
The World Trade Center was a commercial office complex, covering 16 acres, in downtown Manhattan. As many will recall, on February 26, 1993, a bomb exploded in the public parking garage located beneath the concourse of the buildings, killing six people, injuring many others, and disrupting businesses. The explosives were placed in a van which was driven in and parked in the public parking area of the garage, the perpetrators left the garage, and then detonated the bomb. In March 1994, four individuals were convicted of placing and detonating the explosive device. Plaintiffs basically contend that the Port Authority failed to implement security measures, by, inter alia, keeping the parking garage open to public transient parking, which would have kept the bomb out of the garage, and failed to mitigate the resulting injuries and destruction.{**3 Misc 3d at 443}

Background

A. The Port Authority and the World Trade Center

The Port Authority was created in 1921 when Congress consented to a compact between New York and New Jersey to develop and coordinate the terminal, transportation, and other facilities of commerce in, about, and through the Port of New York. (See McKinney's Uncons Laws of NY §§ 6401-6423; L 1921, ch 154.) The Port Authority owns and/or operates many such facilities, including three major airports, interstate bridges and tunnels, an intercity rail system known as the Port Authority Trans-Hudson rail (PATH), bus stations, and, before its destruction on September 11, 2001, the World Trade Center (WTC), one of the city's largest commercial office complexes.
The WTC, constructed by the Port Authority pursuant to a grant of authority in McKinney's Unconsolidated Laws of NY §§ 6601-6618, was a multibuilding commercial and office complex. It was built to bring together facilities such as customs houses, commodity and [*2]security exchanges, exporters and importers, freighters, other offices, and exhibition facilities, with portions of the buildings which "may not be devoted to purposes of the port development project other than the production of incidental revenue" to support the port development project. (See McKinney's Uncons Laws of NY § 6602.) In carrying out the provisions of the law, the Port Authority "shall be regarded as performing an essential governmental function." (McKinney's Uncons Laws of NY § 6610.)
The WTC consisted of two 110-story office towers (One and Two WTC), a 47-story office building (Seven WTC), two nine-story office buildings (Four and Five WTC), an eight-story United States Custom House (Six WTC), and a 22-story hotel (Three WTC). The Concourse, with many shops, restaurants, and services, sat directly below the plaza that connected many of the buildings, and provided direct access to the Twin Towers. (Exhibit C to notice of motion, affidavit of August K. Preschle, dated Mar. 18, 1994, ¶ 3 [a]-[b].) The WTC was served by the PATH system and the New York City subway system.
Beneath the Concourse, below grade level, there were six sublevels, identified as B-1 to B-6. (Id. ¶ 3 [f].) These subgrade areas included: parking facilities for the public and tenants; tenant storage areas; a truck dock; mechanical equipment rooms; utility mains and connections; operations and maintenance support facilities; the WTC terminal of the PATH, with tracks and equipment; emergency generators; communication systems; {**3 Misc 3d at 444}fire standpipes; main feeder lines for electrical power; and the chiller plant for the air-conditioning system. (Id.) The operations control center, which served as the center for fire alarm communications, the public address system and other system alarms, as well as a communications center and a routing center for critical maintenance facilities and functions, was located off the truck loading dock, on the B-1 level. (Plaintiffs' Steering Committee exhibit 41, WTC floor plans.)

1. Parking at the WTC

The parking areas in the B-2 level were accessible to the public from two vehicle entry ramps on West Street, ramps A and B, which had no barriers (plaintiffs' Steering Committee exhibit 5 [Coppolecchia deposition at 92]), and two exit ramps, ramps C and D, which permitted exit back onto West Street. (Id.) There were 400 public parking spaces, and approximately 1,600 tenant spaces. (Plaintiffs' Steering Committee exhibit 2 [Tozzoli deposition at 220].) The subgrade areas were also accessible through the truck dock entrance, located on Barclay Street (plaintiffs' Steering Committee exhibit 5 [Coppolecchia deposition at 88-90]), and this entrance was manned. (Exhibit 2 [Tozzoli deposition at 167].)
The passenger car entrances on West Street were not manned, but there was a ticket office, off the main ramp or road, run by the parking manager. (Id.; affidavit of Peter T. Caram, dated Apr. 9, 2003, ¶¶ 20-21.) The truck entrance had a gate and a guard post at which the truck, and its destination and contents, would be logged. (Plaintiffs' Steering Committee exhibit 10 [Linn deposition at 86].) Tenant parking was also accessible through the truck dock entrance, but if they used that entrance they had to present identification. (Exhibit 2 [Tozzoli deposition at 167].) Transient public parkers who attempted to use the truck dock entrance were directed to the West Street entrances. (Defendant's exhibit E [Preschle deposition at 156, 158].) It was possible for a car to come in an entrance to the garage on West Street and then to leave the garage, essentially driving in a "u" or a circle, without encountering a security checkpoint, either barriers or security personnel. (Plaintiffs' Steering Committee exhibit 5 [Coppolecchia deposition at 107-108]; exhibit 10 [Linn deposition at [*3]82].)

2. Security at the WTC

The WTC was run by the World Trade Department of the Port Authority, which determined whether to open parts of the WTC to the public, whether public parking should be offered,{**3 Misc 3d at 445} and what security should be provided for the buildings and the garage. (Plaintiffs' Steering Committee exhibits 2, 3 [Tozzoli deposition at 33, 246-247, 278].) Civilian management personnel had responsibility for the day-to-day administration of security guards assigned to the WTC. The Port Authority Police had a command post on the B-1 level, and were responsible for public safety. (Defendant's exhibit F [Maikish deposition at 105-109].) The civilian security guards were not police officers, did not carry weapons or handcuffs, and reported to the World Trade Department, not to the Port Authority Police. (Plaintiffs' exhibit 4 [Censullo deposition at 47-48]; exhibit 24 [Feliciano deposition at 57-59, 63].) They provided security, were information agents (providing information and directions to the public), monitored access to the complex, reported accidents to the police, and detected intruders. (Plaintiffs' exhibit 15 [Maikish deposition at 113-114]; exhibit 5 [Coppolecchia deposition at 53-54].) The police were responsible for criminal investigations and accidents. (Plaintiffs' exhibit 5 [Coppolecchia deposition at 53].)

B. The Port Authority Establishes a Terrorism Planning Office

In the early 1980's the Port Authority was aware of terrorist activities occurring in other areas of the world, and that the WTC, as a highly symbolic target, was vulnerable to terrorist attack. (Defendant's exhibit P [Caram deposition at 46-47, 58-60].) Terrorist bombings, including car bombs, were becoming more prevalent, not only in the world but in the United States as well. (Id. at 58-60; see also affidavit of Ellen J. Tidd, dated Apr. 10, 2003, ¶¶ 7, 11-19; affidavit of Denis Dalton, dated Apr. 11, 2003, ¶¶ 14-15.) In fact, the Port Authority recognized that, in 1983-1984, two thirds of domestic terrorist incidents occurred in the New York-New Jersey metropolitan region. (Defendant's exhibit Q [Office of Special Planning Report] at 000002 PASD.)
In response, the Port Authority created a Terrorist Planning and Intelligence Section, and assigned Detective Sergeant Peter Caram the tasks of identifying terrorist groups and Port Authority targets, and to assess the vulnerability of Port Authority facilities to terrorist attack. (Affidavit of Peter Caram, dated Apr. 9, 2003, ¶¶ 10-12; defendant's exhibit P [Caram deposition at 30-31, 46-47, 50, 58-60].) The Terrorist Planning Section submitted its report in 1984, in which it warned that the threat of domestic terrorism was rising, that the WTC was vulnerable to terrorist attack, and that the underground public parking garage was highly vulnerable, easily accessible, and, if attacked, could critically affect the WTC's infrastructure. (Caram affidavit{**3 Misc 3d at 446} ¶ 12; defendant's exhibit P [Caram deposition at 46-47, 50]; plaintiffs' exhibit 21 [Caram deposition at 53-56].)
In another report, entitled "Terrorist AssessmentWorld Trade Center1984," prepared at the request of the Port Authority Superintendent of Police, the Port Authority was warned that, more than at any time in its history, the WTC should be considered a prime target for domestic and international terrorists. (Plaintiffs' exhibit 34 at 2.) The report also specifically warned that the parking lots "are accessible to the public and are highly susceptible to car bombings." (Id. at 11.)
Later that year, again in 1984, the Port Authority created the Office of Special Planning (OSP) to address and evaluate the vulnerabilities of Port Authority facilities to terrorist acts, and to formulate recommendations to prevent and minimize the risks of such acts. (Plaintiffs' exhibit 52; defendant's exhibit Q [OSP Report] at 000002 PASD.) Port Authority Executive Director Peter [*4]Goldmark, in a memorandum to Vic Strom, Director of the Port Authority's Public Safety Department, Edward O'Sullivan, Director of OSP, and Hank DeGeneste, the Assistant Superintendent of Port Authority Police, noted the particular concern the authorities at Scotland Yard expressed to Port Authority officials in August 1984, about the vulnerability of the WTC parking garage to terrorist attack. He stated that those at Scotland Yard "are appalled to hear we had transient parking directly underneath the towers." (Plaintiffs' exhibit 55; see also Caram affidavit ¶ 13.)
The OSP staff included Port Authority civilian or police personnel with experience in terrorism, operational security, tactical technology, bomb investigation, operations, and military operations. (Plaintiffs' exhibits 12, 13 [O'Sullivan deposition at 150-151, 176, 464-465].) OSP's Director, Mr. O'Sullivan, was experienced in terrorism and counter-terrorism from his 10-year career in the Navy and Marine Corps. (Plaintiffs' exhibit 12 [O'Sullivan deposition at 7-49].) OSP's mission was "to study and prepare measures which would make Port Authority facilities less vulnerable to terrorist attack, to improve the organization's prevention and defensive capabilities, to establish liaison with foreign and domestic units engaged in counter-terrorism activities and to develop an awareness among staff of the potential terrorist threat and the need for vigilance and preparedness." (Defendant's exhibit Q [OSP Report] at 000002 PASD.) OSP consulted with the FBI, the CIA, the National Security Agency, United States Secret Service, United States Department {**3 Misc 3d at 447}of Transportation, Department of State, Department of Defense, and security officials from the governments of France, England, Italy, Switzerland and Israel, as well as private consultants. (Defendant's exhibit G [NY Senate Hearings, Mar. 22, 1993] at 324-326; exhibit K [O'Sullivan deposition at 99-100].) The scope of OSP's activities included reviewing and addressing vulnerabilities, identifying alternatives and solutions, presenting recommendations to the facility's management, and obtaining responses from each facility that would be coordinated with the Director of Public Safety.

f>A. OSP's Study of the WTC

The OSP spent four to six months studying the WTC, including its building design through examination of photographs, blueprints, diagrams, and plans. OSP brought in experts, such as those who built the WTC, and those who operated it, as well as experts familiar with sabotage and explosives, and had them walk through to assess what was vulnerable, and identify critical areas of the WTC that, if damaged, could impair the building's ability to function or require it to shut down. (Plaintiffs' exhibit 13 [O'Sullivan deposition at 300-301].) The OSP visited other large commercial buildings in the City, reviewing their security and the way they handled and responded to bomb threats. (Id. at 323.)
To formulate its recommendations, OSP conducted a "target analysis" in which it analyzed Port Authority targets in terms of "criticality, accessibility, vulnerability, recuperability and extended effect that destruction of the specific target" would have. (Defendant's exhibit Q [OSP Report] at 000003 PASD.) Criticality is the measure of the impact on the normal flow of events by the target's destruction. Accessibility refers to the terrorist's ability to reach and attack a vincible point. Vulnerability is the extent to which the target would be damaged. Recuperability is the speed at which normal operation would resume after an attack. Finally, OSP evaluated the extended effect of destruction of the target. (Id.)
In a preliminary report entitled "WTC Study Brief" (plaintiffs' exhibit 37), OSP staff [*5]considered several attack scenarios, including, most significantly, a "[b]omb-laden truck attack." In the report, it was stated that, given the recent truck bombings in Lebanon, it was important to consider this possibility, and that a "strategically positioned truck or van could cause extensive structural damage to the Trade Center as well as a large number of casualties." (Id. at 000106 PASD.) OSP raised questions {**3 Misc 3d at 448}about this scenario, including which areas, i.e., across the street or in the parking lot below, provide the greatest "bang for the buck," what security exists for a truck bombing at WTC, and what other security measures against this scenario are viable. (Id.)
In 1985, before the OSP issued its report, the Port Authority hired an outside security consultant, Charles Schnabolk, to review the WTC's security systems. Schnabolk's report focused on the threat of terrorism to the WTC. (Plaintiffs' exhibit 33 [Schnabolk Report] at 000153-000155 PASD.) Schnabolk, in a letter to O'Sullivan, urged that action be taken as soon as possible to implement his recommendations. (Plaintiffs' exhibit 56.) In the report, the terrorist threat of "bombing attempts" was placed in the "probable" category, and the report warned that the WTC "is highly vulnerable through the parking lot . . . With little effort terrorists could create havoc without being seriously deterred by the current security measures." (Plaintiffs' exhibit 33 at 000155 PASD.) The report also made specific recommendations regarding security in the subgrade levels:
"1. The parking area needs better surveillance. This can be accomplished through the control systems which are proposed to operate at a sub-grade level. The parking lots also require CCTV and mirrors for security and safety purposes.
"2. Vehicles coming to Port Authority parking areas may be screened for the presence of explosives. This can be done by inspecting trunks of cars and examining the undersides of vehicles.
"The procedures would not substantially slow down the parking of vehicles in these areas. While it may be considered security overkill to establish such a security check, the measure can be instituted easily with the use of CCTV and mirrors placed in a trough over which the vehicles drive." (Id. at 000155-000156 PASD.)

1. The OSP Report

In November 1985, OSP issued its report entitled "Counter-Terrorism Perspectives: The World Trade Center" (the OSP Report). The OSP Report recognized that the WTC was a "most attractive terrorist target" based on its symbolic value, its visibility, and the fact that it is immediately recognizable to people from around the world. (Defendant's exhibit Q at 000012 PASD.){**3 Misc 3d at 449} The report listed 25 bombing incidents that took place in and around New York City from 1980-1984, including several car bombing incidents. It also listed a bombing at the beginning of 1985 in an office building just a few blocks from the WTC, and the Port Authority was aware of three bombs that had been placed in downtown buildings in August of 1985. (Id. at 000013-000015 PASD; see also plaintiffs' exhibit 58.) The OSP Report specifically warned that[*6]"[t]he car bomb is fast becoming the weapon of choice for European terrorists and the fact that parking an explosives-laden vehicle provides substantial escape time for the driver is ample justification to take decisive target hardening measures in this area." (Id. at 000018 PASD.)
The underground public parking garage was particularly singled out as a "definite security risk." (Id.) The OSP Report specifically found that "[p]arking for 2,000 vehicles in the underground areas presents an enormous opportunity, at present, for terrorists to park an explosive-filled vehicle that could affect vulnerable areas." (Id. at 000006 PASD.) It warned that the garage was so vulnerable because it afforded "unimpeded access for someone bent on putting a car bomb into the World Trade Center parking lot," which would affect "[v]irtually all of the important building systems, such as power, water, heating, [and] cooling," because those systems all were located in and around the parking areas. (Plaintiffs' exhibit 13 [O'Sullivan deposition at 316-317].)
In proposing potential terrorist scenarios at the WTC, the OSP Report predicted nearly precisely how the February 26, 1993 bombing would occur:
"A time bomb-laden vehicle could be driven into the WTC and parked in the public parking area. The driver could then exit via an elevator into the WTC and proceed with his business unnoticed. At a predetermined time, the bomb could be exploded in the basement. The amount of explosives used will determine the severity of damage to the area." (Defendant's exhibit Q at 000016 PASD.)
With respect to the public parking, the OSP Report recommended taking "decisive target hardening measures in this area" by eliminating all public parking, because "explosives may be readily concealed within a vehicle parked within the core of the complex." (Id. at 000018 PASD.) OSP's Director, O'Sullivan, testified at his deposition that because terrorists conduct surveillance of potential targets to determine the one with {**3 Misc 3d at 450}the greatest impact with the least risk to themselves, they can be deterred if they get a sense that the facility is protected, guarded, and presents some risk to them. (Plaintiffs' exhibit 13 [O'Sullivan deposition at 298].) OSP also recommended: providing manned entrances to the public parking area; restricting pedestrian entry into the parking areas via the ramps; subjecting vehicles to random inspections; and providing a police patrol with an explosives-detection dog. (Defendant's exhibit Q at 000019 PASD.) The OSP Report was submitted to the Executive Director of the Port Authority, the Director of Public Safety of the Port Authority, the Superintendent of the Port Authority Police, and the Director of the World Trade Department.

2. Port Authority's Actions with Respect to OSP's Recommendations

Guy Tozzoli, the Director of the World Trade Department, in February 1986, in a letter to Stephen Berger, the Port Authority's Executive Director, addressed the OSP's recommendations. (Plaintiffs' exhibit 36.) With respect to the subgrade levels and OSP's recommendation to ensure proper venting of smoke evacuation devices, Tozzoli responded that adequate ventilation was being provided by the subgrade exhaust fans. (Id. at 000175 PASD.) As to the public parking recommendations, Tozzoli responded that: (1) the elimination of transient parking would not be implemented, because of the inconvenience to tenants and the loss of revenues; (2) manning the [*7]public parking would be too expensive and would not deter a terrorist; (3) restricting pedestrians is impractical because there are many other ways to gain access to the areas; and (4) random inspections of vehicles could not be done without probable cause. (Id. at 000176 PASD.)

f>A. The SAIC Report

The Port Authority sought a second opinion about the OSP's recommendations, and hired an outside consultant, Science Applications International Corporation (SAIC), to conduct a general security review of the WTC. (Plaintiffs' exhibit 14 [Strom deposition at 70-71].) SAIC was given a copy of the OSP Report as well as Tozzoli's letter to Berger rejecting OSP's recommendations about the subgrade level. (Defendant's exhibit V at 000051 PASD [SAIC Report].) SAIC's Report rated the attractiveness of the WTC's public areas to terrorist attack as "very high." (Id. at 000030 PASD.) It identified the vehicle ramps as vulnerable areas. (Id. at 000031 PASD.) It specifically noted that vehicle access for security purposes is uncontrolled. (Id.) The report found that a "well-placed vehicle bomb in each of {**3 Misc 3d at 451}these locations [the vehicle ramps] would likely damage at least half of the support services (fresh water, steam, cooling water, electrical and telephone) to the WTC users." (Id. at 000032 PASD.) The SAIC Report found that an adversary would have "little difficulty" in procuring explosives which are "readily available" in the quantities envisioned in the report. (Id. at 000047 PASD.) Like the OSP Report, the SAIC Report described an attack scenario, remarkably like the one which occurred, in which a small delivery truck with explosives could be positioned on a ramp to the complex, and detonated following a short time delay for the driver's escape. (Id.) It recommended certain possible upgrades, including installing blast deflectors around critical support service components (water, electrical, phone), eliminating parking in subgrades, conducting vehicle searches at truck entrances, conducting random searches of all vehicles, and developing redundant support service capabilities. (Id. at 000033 PASD.) These upgrades, however, had been deemed "very costly either in terms of operational impact, public acceptance, or monetary cost," though SAIC admitted that it had not provided any cost analysis to the Port Authority (plaintiffs' exhibit 23 [Veatch deposition at 200-202]), and that the costs were not further analyzed. (Id. at 000034-000035 PASD.) In SAIC's presentation to the Port Authority's Executive Director in October 1986, SAIC featured "barriers to deter car bomb attempts" at a cost of $83,000, as an upgrade "for immediate implementation" to counter a terrorist attack, with a risk reduction figure of 40%. (Plaintiffs' exhibit 30, at 000162 PASD.) The presentation also included a comparison of OSP's recommendations about eliminating parking, or instituting more stringent controls and monitoring, and SAIC's recommendation that these actions were "considered but not recommended" based on discussions with the Port Authority. (Id. at 000163 PASD; defendant's exhibit K [O'Sullivan deposition at 422-425].)

f>A. The Burns and Roe Securacom Report

In 1991, because of the Gulf War and the increased risk of terrorism to United States targets (see Caram affidavit ¶ 30), the Port Authority commissioned another security consulting firm, Burns and Roe Securacom, to prepare reports. Securacom was told by the Port Authority that the WTC was a terrorist target, and the report would help it plan its capital expenditures to maintain its competitive status with nearby buildings that offered more advanced security features. (Plaintiffs' exhibit 39.){**3 Misc 3d at 452} Securacom's draft report recognized that in the "aftermath of MidEast events," there would be a significant increase in "international activities." (Defendant's exhibit X at 000055 PASD.) It included the subgrade utilities and the parking garage [*8]as areas of vulnerability. (Defendent's exhibit X at 000058, 000064 PASD.) Its final report recommended that the WTC adopt a master plan approach to the development of security systems. (Plaintiffs' exhibit 27.)
On January 23, 1993, one month before the bombing, the Port Authority received an intelligence report from the FBI that there was a threat from the MidEast to blow up a major office building in New York. (Plaintiffs' exhibit 15 [Maikish deposition at 211-220]; Caram affidavit ¶ 31; affidavit of Joseph Martella, dated Nov. 15, 2002, ¶ 26.) Some heightened security measures were implemented over that weekend (Jan. 23 was a Friday) as a result, including some increased patrols around the perimeter, which patrols also drove through the underground areas, but these were scaled back after the weekend was over. (Martella affidavit ¶ 26; plaintiffs' exhibit 15 [Maikish deposition at 215-219].)

F. The Bombing

On February 26, 1993, at 12:18 p.m., a bomb exploded beneath the WTC, on the B-2 level of the underground parking garage, on a ramp that leads toward an exit from the garage. (See affidavit of Jan Gilhooly, dated Dec. 23, 2002.) The explosion had the force of 1,500 pounds of dynamite. (Plaintiffs' exhibit 65 [Goodman hearing transcript at 67].) The investigation revealed that the bomb had been detonated in a yellow van parked on the ramp of the public parking garage. (Plaintiffs' exhibit 64 [Goodman Report at 10].) Six people were killed, and many, many more were injured, mostly from smoke inhalation. (Plaintiffs' exhibit 65 [Goodman transcript at 67].) There was evidence that the perpetrators had made several surveillance visits to the garage, and drew maps of the garage. (Plaintiffs' exhibit 15 [Maikish deposition at 221, 268-269].) The explosion made a crater six stories deep, compressed several levels of concrete slab, blew down a wall onto the PATH concourse, and destroyed the walls of a number of elevator shafts. (Plaintiffs' exhibits 64 [Goodman Report at 10], 63 [House hearing transcript at 26].) The explosion destroyed the communications system, the police area and operations control center, and vital utility systems, including water and electrical, and fire standpipes. (Plaintiffs' exhibit 65 [Goodman hearing transcript at 71{**3 Misc 3d at 453}-72].) Because of the loss of the operations control center, the Port Authority lost the ability to communicate with tenants and their employees in the complex, and to institute its emergency evacuation procedures. (Plaintiffs' exhibit 64 [Goodman transcript at 26].)

G. Plaintiffs' Claims

Plaintiffs' claims are based on their allegations that the Port Authority was negligent with respect to security: in failing to adopt, implement, and follow the recommendations in the security reports; in failing to restrict public access to the parking levels; in failing to have an adequate security plan; in failing to provide an electronic security system; in failing to institute a manned checkpoint at the garage; in failing to subject vehicles to inspection and to have security signs; in failing to have adequate security personnel; in failing to employ recording devices concerning vehicles, operators, occupants, and pedestrians; and in failing to conduct studies of the possible results of a bombing of the complex. (Defendant's exhibit DD at 2-3.) The claims also are based on alleged failures with respect to the ventilation system, that is, in failing to have a proper and adequate regular and emergency ventilation system in case of fire and explosion. Plaintiffs also claim that the Port Authority failed to provide adequate lighting, to use air-cooled emergency generators, and to have adequate communications and backup communications systems. They further claim that the Port Authority failed to properly train and communicate with [*9]the fire wardens, and train employees on proper evacuation procedures. (Id. at 4-8.)

H. This Motion for Summary Judgment

The Port Authority is moving for summary judgment dismissing plaintiffs' negligence claims. First, it argues that it cannot be held liable in negligence as a matter of law for failing to protect plaintiffs from the criminal acts of third parties, because providing such protection is a governmental function. The Port Authority contends that plaintiffs' claims are based on the failure to provide security, which it urges is a governmental function. It points to the legislation establishing the Port Authority (McKinney's Uncons Law of NY § 6610) as proof that it was performing an essential governmental function in undertaking to provide safety and security to the patrons at the WTC. It asserts that the activities for which plaintiffs want to hold the Port Authority liable essentially involve, or grow directly out of, the failure to allocate police resources. The Port Authority also urges that the principle that a government agency owes no duty to {**3 Misc 3d at 454}a victim of crime on government premises extends beyond the deployment of police officers to other security contexts, including those set forth in plaintiffs' claims here. It contends that plaintiffs are challenging the Port Authority's decisions regarding the allocation of resources to address potential vulnerabilities identified in the OSP and follow-up reports, which decisions, it contends, are legislative-executive ones, and are not for the courts. The Port Authority further contends that plaintiffs cannot establish a special relationship which might give rise to liability, because there was no direct communication between plaintiffs and the Port Authority in which plaintiffs sought and obtained promises from the Port Authority to provide protection from the events that happened on February 26, 1993.
Second, the Port Authority contends that, even if it is determined that it was not performing a governmental function, it still would not be liable, because the bombing was not foreseeable as a matter of law. It points to the lack of evidence of similar criminal acts at the WTC. The Port Authority claims that the prerequisite for liability is the likelihood of crime, not the mere possibility. It urges that the courts have repeatedly held that the existence of ambient crime in the neighborhood is not a sufficient basis for holding a building owner liable for the criminal acts of third parties on the premises. It contends that the alleged basis for the predictability of the bombing, a security report, is not the equivalent of crime on the premises or actual crime in the neighborhood. The Port Authority maintains that plaintiffs have failed to present any evidence that an explosive-laden vehicle had been placed in the WTC prior to February 26, 1993, and that, therefore, plaintiffs have failed to establish a predicate for holding the Port Authority liable. It asserts that the OSP Report raised the possibility of a bombing, not the likelihood of its occurrence.
In opposition, plaintiffs make several arguments. They counter the Port Authority's governmental immunity argument by citing to McKinney's Unconsolidated Laws §§ 7101 and 7106, not mentioned in the Port Authority's moving papers, in which the Port Authority waives such immunity, and consents to liability in suits for tortious acts committed by it "to the same extent as though it were a private corporation." (McKinney's Uncons Laws § 7106.) Plaintiffs assert that this statute waives the Port Authority's potential immunity more broadly than other waiver statutes applicable to other governmental entities. They contend that they are seeking damages for the Port Authority's {**3 Misc 3d at 455}negligent failure to implement appropriate safety precautions in the parking facilities at the WTC, and that, under the plain language of sections 7101 and 7106, plaintiffs are entitled to bring their [*10]actions against the Port Authority.
Plaintiffs further argue that, even assuming that the Port Authority could still assert some kind of governmental immunity defense, the Port Authority's liability here arises from its negligent failures in operating a commercial office building, leased to commercial tenants, and to retail stores, which they claim were clearly proprietary, not governmental, functions. Plaintiffs assert that the facts show that the WTC complex, and in particular, its parking facilities, were commercial facilities, and that the Port Authority's operation of those facilities was not fundamental to its nature as a governmental entity. Further, they contend that security at the WTC was principally provided by civilian managers, and private security guards, not police officers. Thus, plaintiffs assert that the Port Authority's negligence falls along the continuum of responsibility to individuals and society deriving from its proprietary functions, in the sense that the negligence derives from its ownership, maintenance, and care of the WTC complex, including the garage and parking facilities. They claim they are seeking to hold the Port Authority liable, as a private commercial landlord, for its failure to either close the WTC parking garage to transient parking, or to implement any reasonable security measures in the face of a known threat. Plaintiffs distinguish these actions from those involving the failure to allocate police resources, such as the absence of police surveillance and the failure to warn of criminal activity. They assert that the facts of the size and complexity of the WTC, and that it serves a great number of people, do not require the conclusion that precautions taken for the security of the facility are transformed into governmental functions. They urge that the omissions complained of involve the provision of basic security measures, and that the Port Authority made such omissions in its capacity as a private landlord.
Alternatively, if the Port Authority's negligence arises from its exercise of a governmental function, plaintiffs maintain that the Port Authority had special relationships with them, and that it therefore may be held liable for its negligence in the performance of that function. They claim that whether there was a special relationship is a question of fact not resolvable on a motion for summary judgment.{**3 Misc 3d at 456}
Finally, plaintiffs argue that the Port Authority could not possibly argue that the bombing was unforeseeable as a matter of law, because, in fact, not only was it foreseeable, but it was actually foreseen. They urge that the undisputed facts show that domestic terrorism was on the rise, car bombs were the preferred method, the WTC was a prime target for a terrorist attack, and the parking garage was highly vulnerable. They contend that the record establishes that the Port Authority knew, or at the least, should have known, that there was a likelihood that third parties would engage in conduct that would endanger the safety of those using the premises, and that it was obligated to take measures to safeguard against that risk. Plaintiffs contend that, contrary to what the Port Authority is arguing, a landlord does not have to have past experience with the precise sort of criminal activity in the same place before a landlord could be found negligent in failing to take precautions that would have prevented the crime. Plaintiffs point to the evidence in the record that prior to the WTC bombing there had been successful terrorist bombings of buildings in the immediate neighborhood, and that the FBI had warned, just a month before, that Middle Eastern terrorists had threatened to blow up a major office building in New York, to show that the bombing was foreseeable. They aptly assert that the law does not permit, as the Port Authority appears to claim, a landlord one free catastrophic event, particularly where, as in [*11]this case, the Port Authority was aware of the threat of terrorism, was aware that the WTC was a potential target, and was specifically warned by its own experts, as well as by other terrorist experts, of exactly the type of attack that occurred in 1993. Plaintiffs further contend that, at the least, the issue of foreseeability is a question for the jury. Plaintiffs urge that the Port Authority failed to implement reasonable safety precautions in the underground parking garage, leaving it completely open and accessible, and that the issue of the reasonableness of safety precautions is almost always a factual issue for the jury.
Certain plaintiffs, such as Dean Witter, who were tenants in the WTC at the time, contend that, even if the Port Authority's motion were granted, which it should not be, not all the claims should be dismissed because some of the claims are for breach of lease, which claims are not addressed in any way by the Port Authority. I accordingly do not reach those claims in this decision.
In reply, the Port Authority concedes that the reasonableness of safety precautions cannot be decided on a motion for summary{**3 Misc 3d at 457} judgment (see defendant's reply brief at 8 n 2), but maintains that the bombing was not foreseeable as a matter of law. It asserts that courts have held that a landlord may not be held liable unless it had notice of the likelihood of such crime on the premises, based on a history of actual crimes on those premises sufficient to alert the landlord that the crime injuring the plaintiff was likely to occur on the property. It contends that plaintiffs cannot point to any previous cases in which the courts have relied on proof such as plaintiffs', e.g., the reports, which it claims are general statements, as opposed to actual crime on or near the premises, at times, and of such number, as to put a landlord on notice of the likelihood of similar crime being perpetrated on the plaintiffs. On the issue of governmental immunity, the Port Authority argues that, while in McKinney's Unconsolidated Laws § 7106 the Port Authority waives sovereign immunity to suit in tort, it has not given up its substantive defense of governmental immunity. On the substantive defense, it urges that plaintiffs cannot show a duty owed by the Port Authority to them for the alleged negligence in providing security against crime in government facilities, such as the WTC. It contends that government immunity is not limited to the deployment of police resources, as plaintiffs argue. Finally, it contends that no special relationship was created by virtue of plaintiffs' entry into the WTC.

Discussion

The Port Authority's motion for summary judgment is denied except to the limited extent that it is granted herein. There are triable issues of fact warranting a trial with respect to some of plaintiffs' allegations of negligence.

Summary Judgment

The proponent of a motion for summary judgment " 'must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact.' " (Ayotte v Gervasio, 81 NY2d 1062, 1063 [1993] [citation omitted]; Estate of Nevelson v Carro, Spanbock, Kaster & Cuiffo, 259 AD2d 282 [1st Dept 1999].) Failure to make such a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers. (Ayotte v Gervasio, 81 NY2d at 1063; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985].) Once such a showing has been established, the burden shifts to the opposing parties to produce "evidentiary proof in admissible form sufficient{**3 Misc 3d at 458} to establish the existence of material issues of fact which [would] require a trial" as to these issues. ([*12]Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see also Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369 [1977], cert denied 434 US 969 [1977].) If there is any doubt as to the existence of a triable issue, or where the issue is even arguable, summary judgment is inappropriate. (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]; Chemical Bank v West 95th St. Dev. Corp., 161 AD2d 218, 219 [1st Dept 1990].) For the reasons delineated below, the court concludes that, based on statutes and case law, the Port Authority was not immune from liability for at least some of plaintiffs' negligence allegations, and that, based on the deposition testimony, the documentary evidence and affidavits, plaintiffs have provided sufficient evidence to demonstrate that there are triable issues of fact with respect to the foreseeability of plaintiffs' damages and injuries.
"Negligence consists of a breach of a duty of care owed to another." (Di Cerbo v Raab, 132 AD2d 763, 764 [3d Dept 1987].) It is axiomatic that, to establish a case of negligence, plaintiffs must prove that the defendant owed them a duty of care, and breached that duty, and that the breach proximately caused the plaintiffs' injury. (See Solomon v City of New York, 66 NY2d 1026, 1027 [1985]; Wayburn v Madison Land Ltd. Partnership, 282 AD2d 301, 302 [1st Dept 2001].) Absent a duty of care to the injured party, a defendant cannot be held liable in negligence. (Palsgraf v Long Is. R.R. Co., 248 NY 339 [1928].) The question of whether a duty of care exists is one for the court to decide. (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053 [1983]; Stankowski v Kim, 286 AD2d 282 [1st Dept 2001], lv dismissed 97 NY2d 677 [2001].) Courts have consistently held that negligence claims should not be resolved at the summary judgment stage. (See e.g. Gilmartin v Helmsley-Spear, Inc., 162 AD2d 275, 276 [1st Dept 1990]; Kahane v Marriott Hotel Corp., 249 AD2d 164, 165 [1st Dept 1998]; Forrester v Port Auth. of N.Y. & N.J., 139 AD2d 449 [1st Dept 1988] [resolution of question of foreseeability is for trier of fact]; Rotz v City of New York, 143 AD2d 301, 304 [1st Dept 1988] [issues of foreseeability are left to finders of fact, even where facts are essentially undisputed].)
This court will first address the Port Authority's arguments that it is immune from liability and, therefore, that it owed no duty as a matter of law, and then its arguments with respect to the foreseeability of the injuries suffered by plaintiffs.{**3 Misc 3d at 459}

Governmental Immunity

To analyze the Port Authority's assertion that it is immune from plaintiffs' negligence claims because it was performing a governmental function, the applicable statutes must be examined. The Port Authority is a joint and common governmental agency of the states of New York and New Jersey. (McKinney's Uncons Laws § 6401; see also Trippe v Port of N.Y. Auth., 14 NY2d 119 [1964].) Although the Port Authority serves a governmental function in many of its undertakings, it is not immune from suit. In 1950 and 1951, the legislatures of New York and New Jersey enacted statutes with identical provisions pursuant to which the Port Authority waived its sovereign immunity to tort claims. (NJ Stat Ann §§ 32:1-15832:1-162; McKinney's Uncons Laws § 7101 et seq.) Before these statutes, the Port Authority, as a direct agency of the State of New York, absent any consent by the State, was completely immune from suits of any kind. (Trippe v Port of N.Y. Auth., 14 NY2d at 123.) In the statutes, the states of New York and New Jersey consented to suits against the Port Authority, and provided, with exceptions not relevant here, that "[a]lthough the port authority is [*13]engaged in the performance of governmental functions," it shall be liable "in such suits, actions or proceedings for tortious acts committed by it and its agents to the same extent as though it were a private corporation." (McKinney's Uncons Laws § 7106; NJ Stat Ann § 32:1-162; see also Port Auth. Trans-Hudson Corp. v Feeney, 495 US 299, 306 [1990].) This consent to suit, and waiver of sovereign immunity, was expressed in expansive terms. (See Port Auth. Trans-Hudson Corp. v Feeney, 495 US at 305-306; see also Lieberman v Port Auth. of N.Y. & N.J., 132 NJ 76, 84, 622 A2d 1295, 1299 [1993] ["we conclude that (the Port Authority's) amenability to suit in the exercise of non-governmental functions is broader than that of agencies authorized only to 'sue and be sued' "].)
In Rittenhouse v A. Star Container Serv. (1988 WL 112898, 1988 US Dist LEXIS 11689 [SD NY, Oct. 17, 1988]), the Port Authority made similar arguments to those made here, seeking summary judgment dismissal on the ground that it had a governmental immunity defense because it was performing a governmental function. The claimed negligence was the Port Authority's alleged failure to maintain the roadway near the site of the accident, in that it knew that the road sign was dangerously low and susceptible to being hit. The United States District Court for the Southern District of New York rejected the {**3 Misc 3d at 460}Port Authority's immunity arguments, finding that section 7106 "makes it clear that the Port Authority does not enjoy immunity for tortious acts committed while performing governmental functions." (1988 WL at *2, 1988 US Dist LEXIS at *5.)
Applied to the instant case, the unambiguous language of sections 7101 and 7106 controls and confirms that the Port Authority has consented to this suit and may not assert the defense of sovereign immunity. (See Trippe v Port of N.Y. Auth., 14 NY2d at 125; Lieberman v Port Auth. of N.Y. & N.J., 132 NJ at 86, 622 A2d at 1300.) These claims fall within the broad coverage of the statute, are not specifically excluded, and therefore are authorized under the terms of those sections.
The next step in the analysis is to determine if the Port Authority owed a duty to plaintiffs. As in the case of an action against a private corporation, it is necessary to decide whether the Port Authority is under a duty to these plaintiffs, irrespective of sovereign immunity. (See Florence v Goldberg, 44 NY2d 189, 195 [1978]; Motyka v City of Amsterdam, 15 NY2d 134 [1965].) "Absent the existence and breach of such a duty, the abrogation of governmental immunity, in itself, affords little aid to a plaintiff seeking to cast a municipality in damages." (Florence v Goldberg, 44 NY2d at 195.) Moreover, to establish liability against a municipality or government agency, the duty breached must be more than a duty owed to the general public, such as the failure to provide police or fire protection. (Id.; see also Motyka v City of Amsterdam, 15 NY2d at 138.)
The Port Authority urges that plaintiffs' negligence claims of failing to close or provide adequate security in the WTC parking garage are simply claims for the failure to provide police protection, a governmental function for which it cannot be held liable absent a special relationship with the plaintiffs. This argument is rejected. The court holds that the plaintiffs' allegations of the Port Authority's negligent acts essentially involve proprietary functions for which the Port Authority owes a duty to them. Contrary to the Port Authority's contentions, the WTC and its public parking garage were primarily commercial facilities, the security was determined and provided by the civilian management and private security guards, and the actions and failures to act involved predominantly the Port Authority's maintenance and security of the [*14]property as a commercial landlord of an office and retail complex, rather than its governmental-executive decision making regarding the provision of resources for police protection.{**3 Misc 3d at 461}
It is well settled that when a public entity acts in a proprietary capacity as a landlord, it is subject to ordinary tort liability. (See Miller v State of New York, 62 NY2d 506, 511-512 [1984]; see also Price v New York City Hous. Auth., 92 NY2d 553, 557-558 [1998].) The entity, however, remains immune from negligence claims arising out of governmental functions, such as police protection, unless a special relationship creates a duty to protect, and the plaintiff relies on the performance of that duty. (Weiner v Metropolitan Transp. Auth., 55 NY2d 175 [1982]; Miller v State of New York, 62 NY2d at 510; Price ex rel. Price v New York City Hous. Auth., 92 NY2d at 557-558.) This dichotomy between proprietary and governmental functions was discussed and analyzed by the Court of Appeals in Miller v State of New York (62 NY2d at 511-512):
"A governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection."
In determining whether the alleged negligent acts qualify as a governmental activity deserving of immunity, or a proprietary act subjecting the public entity to tort liability, " '[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability.' " (Id. at 513, quoting Weiner v Metropolitan Transp. Auth., 55 NY2d at 182.)
Miller involved negligence claims by a student at the State University of New York at Stony Brook, who was criminally assaulted in the laundry room of her dormitory. Plaintiff presented proof of reports to campus security of strangers in the hallways of the dorms, and of men present in the women's bathrooms; news reports of crime in the dorms; and proof that, notwithstanding these reports, the doors at all 10 entrances to the dorm were concededly kept unlocked at all hours, though they contained locking mechanisms. (Id. at 509.) In analyzing the {**3 Misc 3d at 462}claim, the Court of Appeals stated that "[w]hen the State operates housing, it is held to the same duty as private landlords in the maintenance of physical security devices in the building itself." (Id. at 508.) It found that the student may recover damages against the State in its capacity as a landlord, upon a showing that "there was a reasonably foreseeable likelihood of criminal intrusion into the building, that the State negligently failed to keep the outer doors locked, and that the failure was a proximate cause of the injury." (Id. at 509.) The Court noted that the student was not proceeding on a theory of the failure to provide police protection. Instead, she was proceeding on her theory that the State failed as a landlord to properly maintain the dorm, by [*15]failing to maintain reasonable security, specifically, by failing to lock the entrances. (Id. at 510-511.) The Court, while recognizing the defendant's dual role, held that the "[o]wnership and care relating to buildings with tenants has traditionally been carried on through private enterprise, specifically by landlords and thus constitutes a proprietary function when performed by the State." (Id. at 513.)
The Miller court described the State's duty to act as a reasonable person by maintaining the premises in a reasonably safe condition, under all the circumstances, such as the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk. (Id. at 513.) Thus, a landlord "has a duty to maintain minimal security measures, related to a specific building itself, in the face of foreseeable criminal intrusion upon tenants." (Id. at 513, citing Nallan v Helmsley-Spear, Inc., 50 NY2d 507 [1980].)
The Miller court was following the framework set out in Weiner v Metropolitan Transp. Auth. (55 NY2d 175 [1982], supra). In Weiner, decided several years before Miller, the plaintiff was assaulted while attempting to enter an unmanned entrance to a subway station. The activities for which plaintiff sought to hold the Transit Authority liable included the absence of police surveillance at the entrance, and the failure to warn of criminal activity in the area, or to close the entrance when police protection was not available. (Weiner v Metropolitan Transp. Auth., 55 NY2d at 182.) The Court held that the Transit Authority owed no duty because the plaintiff sought to hold it liable on the limited theory that it failed to allocate police resources. (Id.)
In Crosland v New York City Tr. Auth. (68 NY2d 165 [1986]), the Court of Appeals looked again at Weiner and clarified that "Weiner did not . . . absolve publicly owned common carriers from {**3 Misc 3d at 463}liability for assaults on their passengers by third parties in all cases." (Id. at 169.) In Crosland a student was beaten to death by a group of teens at a train station. The Court found that the Transit Authority could be held liable, because the complaint alleged that the Authority's employees had watched the beating from a position of safety, but failed to summon aid. This the Court found actionable, and outside the boundaries of the policy-based immunity established in Weiner. (Crosland v New York City Tr. Auth., 68 NY2d at 170.)
The New Jersey Supreme Court's decision in Lieberman v Port Auth. of N.Y. & N.J. (132 NJ 76, 622 A2d 1295, supra) is particularly instructive with respect to the Port Authority's immunity for governmental functions. In Lieberman, the court concluded, relying on both New York and New Jersey law, that the plaintiff, a commuter, stated a claim against the Port Authority for injuries she sustained when a homeless man robbed her in the Port Authority bus terminal. The Lieberman court, while considering Weiner and Crosland, noted important differences between the New York City Transit Authority and the Port Authority. "First, although both serve to assist commuters in getting to their destinations, the Port Authority does much more. Not only does it operate a bus depot at the Terminal, but it also rents space to shops, businesses, and restaurants." (132 NJ at 90, 622 A2d at 1302.) This distinction is also appropriate here, since the Port Authority was operating a commercial office complex, with many diverse tenants, shops, and restaurants, as well as a parking garage open to the tenants and the public.
Second, the Lieberman court recognized that the New York City Transit Authority's waiver statute is not as broad as the Port Authority's, and concluded that the burdens and duties of the two Authorities are not completely analogous. (Id.) The Lieberman court found the Miller case to be the more applicable precedent. It found that the duty to provide a reasonably safe [*16]premises does not automatically translate into the duty to provide greater police protection. (132 NJ at 93, 622 A2d at 1304.) "Rather, the inquiry is directed to whether the Port Authority as the landlord of the Terminal had the duty to provide better lighting, signs, security cameras, and other measures to increase commuter safety." (Id.) To the extent that the plaintiff's claims were questioning the Port Authority's management of the homeless, the Lieberman court held that those claims failed if they involved legislative or governmental decisions. (132 NJ at 94, 622 A2d at 1304.){**3 Misc 3d at 464}
The Port Authority has been held liable for acting in its proprietary capacity in various other situations, such as failing to maintain the road and road signs outside the Lincoln Tunnel (Rittenhouse v A. Star Container Serv., 1988 WL 112898, 1988 US Dist LEXIS 11689, supra), failing to maintain the airport runways and taxiways (Japan Airlines Co., Ltd. v Port Auth. of N.Y. & N.J., 178 F3d 103 [2d Cir 1999]) and terminal, and failing to properly design and maintain the airport taxistand (Forrester v Port Auth. of N.Y. & N.J., 139 AD2d 449 [1988], supra).
In this case the difficulty, as in Miller, arises from the Port Authority's dual role. While the Port Authority had governmental functions in connection with its operation and control of the WTC, such as the provision of police protection provided by the Port Authority Police, it also had proprietary functions as a commercial landlord, maintaining an office building which included numerous retail stores in an enclosed shopping mall. (See Lieberman v Port Auth. of N.Y. & N.J., supra, 32 NJ at 88, 622 A2d at 1301.) As instructed by Miller, the focus is on the specific act or omission out of which the plaintiffs' injuries are claimed to have arisen, and the capacity in which that act, or failure to act, occurred. Contrary to the Port Authority's contention, the duty to provide security in the WTC, and to provide a reasonably safe premises for its invitees, does not automatically constitute the duty to provide greater police protection. (See Lieberman v Port Auth. of N.Y. & N.J., 132 NJ at 93, 622 A2d at 1304.) Plaintiffs are seeking to hold the Port Authority liable for its failure to either close or restrict public access to the parking garage. They also seek recovery for the Port Authority's failure to implement other security measures recommended to it by its own security department, as well as outside consultants, including installing barriers to the entrance in the garage, having an electronic security system, having a manned checkpoint at the public garage entrance, inspecting vehicles, posting security signs, and employing recording devices, such as CCTV. These alleged negligent acts fall along the proprietary side of the continuum of responsibility. They stem from the Port Authority's failure as the commercial landlord of this building to physically maintain the building, more particularly the garage, by failing to install security features, and barriers. The ownership and care of a publicly accessible paid parking facility under an office tower and shopping mall, and the provision of these basic security measures, for the commercial tenants, business invitees, and the public, are activities which have traditionally{**3 Misc 3d at 465} been carried on through private enterprise, specifically by commercial landlords, and thus constitute proprietary functions when performed by the Port Authority. (See Miller v State of New York, 62 NY2d at 513; see also Rubino v City of New York, 114 AD2d 243 [1st Dept 1986]; Hess v Port Auth. Trans-Hudson Corp., 513 US 30, 45 n 17 [1994] [Port Authority facilities such as the WTC, "an office complex housing numerous private tenants . . . are not typically operated by either States or municipalities"].) The activities are more analogous to a failure by the State in its proprietary capacity to maintain minimum security measures, such as exterior locks on a building (see e.g. Miller v State of New York, supra), than to the failure to have police patrolling a subway station (see e.g. Weiner v [*17]Metropolitan Transp. Auth., 55 NY2d 175 [1982], supra). This duty does not necessarily implicate the Port Authority Police, and, therefore, does not invoke the Port Authority's governmental functions. (Cf. id. [alleged duty to protect plaintiff from subway assault necessarily implicated Transit Authority police, so no liability].) The alleged negligent actions do not implicate legislative-executive decision making regarding the allocation of police resources.
The Port Authority's reliance on cases finding that the acts alleged involved a public entity engaged in governmental functions is misplaced. Those cases did not involve the entity's operation of a commercial office building, parking garage, and shopping mall. Rather, they involved, for example, the operation of a bus terminal in Gasset v City of New York (198 AD2d 12 [1st Dept 1993], lv denied 88 NY2d 810 [1996]), in which the Court, in a brief memorandum decision, stated that the maintenance and operation of the Port Authority bus terminal was a governmental function. The Port Authority's other cases involved safety in public schools in terms of the allocation of police resources (e.g. Bonner v City of New York, 73 NY2d 930 [1989]; Feinsilver v City of New York, 277 AD2d 199 [2d Dept 2000]; Marilyn S. v City of New York, 134 AD2d 583 [2d Dept 1987], affd 73 NY2d 910 [1989]; see also Laura O. v State of New York, 202 AD2d 559 [2d Dept 1994] [campus security and patrolling in nondormitory building]), a function which has traditionally been governmental, undertaken for the protection and safety of public school children, teachers, and school employees, and which is clearly distinguishable from the alleged negligent security in the WTC's public parking garage. (Cf. Rubino v City of New York, 114 AD2d at 249 [school's failure to take {**3 Misc 3d at 466}steps to protect plaintiff from being hit by debris being thrown into public school yard involved proprietary duty].) Defendant's cases involving a homeless shelter (Akinwande v City of New York, 260 AD2d 586 [2d Dept 1999], lv dismissed in part, denied in part 93 NY2d 1030 [1999]), traffic regulation by the police (Balsam v Delma Eng'g Corp., 90 NY2d 966 [1997]), and policing subway stations (Clinger v New York City Tr. Auth., 85 NY2d 957 [1995]; Calero v New York City Tr. Auth., 168 AD2d 659 [2d Dept 1990], lv denied 78 NY2d 864 [1991]), again, are distinguishable because they involve claims regarding the allocation of police resources and/or legislative-executive decision making. The Port Authority also relies on Price v New York City Hous. Auth. (92 NY2d 553 [1998], supra), which is inapposite to this case. In Price, the plaintiff, who was assaulted by an intruder in an elevator of her apartment building which was owned by the Housing Authority, sought to proceed on a theory that the Housing Authority failed to warn of ongoing criminal activity in the area. (Id. at 557-558.) The Price court found that such a theory involved the governmental function of the allocation of police resources. (Id. at 558.) Here, plaintiffs have not asserted any duty to warn theory, and, therefore, are not implicating such police protection.
To the extent that any of plaintiffs' allegations, not being pursued by them on this motion, could be construed as the failure to have more Port Authority Police patrolling the WTC and the garage, for example, the allegation that the Port Authority failed to have bomb-sniffing dogs patrolling with police officers, those allegations must be and are dismissed as falling within the Port Authority's governmental function, and plaintiffs fail to show a special relationship. To demonstrate a special relationship sufficient to cast a governmental entity in liability for failure to prevent harm from a third party's criminal acts, a plaintiff must show (1) that the agency assumed an affirmative duty to protect him or her through promises or actions; (2) knowledge by the [*18]agency that inaction could lead to harm to plaintiff; (3) direct contact between the agency's representative and the plaintiff; and (4) reliance by plaintiff on the agency's affirmative undertaking to provide protection to him or her. (Cuffy v City of New York, 69 NY2d 255 [1987].) Plaintiffs fail to demonstrate any evidence of promises, direct contact, or any reliance. Accordingly, there is no basis for liability by the Port Authority under the special relationship exception.
Because this court holds that the negligent acts that plaintiffs are pursuing involve the Port Authority's proprietary functions,{**3 Misc 3d at 467} there is no basis as to those acts to grant the Port Authority summary judgment on its governmental immunity defense.

Foreseeability

The next ground for the Port Authority's motion is its contention that the WTC bombing was unforeseeable as a matter of law, and that therefore the Port Authority cannot be held liable. To obtain summary judgment, the Port Authority must meet a high threshold: only one conclusion can be drawn from the undisputed facts, and that, as a matter of law, the injuries to the plaintiffs were not reasonably foreseeable. (See Sanchez v State of New York, 99 NY2d 247, 254 [2002].) The record does not support that conclusion. Whether a risk is foreseeable under particular circumstances has traditionally and soundly been left to the trier of fact to resolve, even where the facts are essentially undisputed. (See Bell v Board of Educ. of City of N.Y., 90 NY2d 944, 946 [1997]; Kahane v Marriott Hotel Corp., 249 AD2d at 165; Rotz v City of New York, 143 AD2d at 304.) The court finds that there are triable issues of fact as to the foreseeability of this catastrophic event, warranting denial of the Port Authority's motion.
A landowner or landlord, who holds its land open to the public, is under a legal duty to exercise reasonable care under the circumstances to maintain the premises in a reasonably safe condition. (Kush v City of Buffalo, 59 NY2d 26 [1983]; Basso v Miller, 40 NY2d 233 [1976].) The duty includes taking minimal security precautions against reasonably foreseeable criminal acts by third parties. (Nallan v Helmsley-Spear, Inc., 50 NY2d at 519-520; see also Jacqueline S. v City of New York, 81 NY2d 288, 295.) This legal duty does not require the landlord to become an insurer of its tenants' and invitees' safety. Rather, it simply imposes a minimum level of care on landlords who "know or have reason to know that there is a likelihood that third parties may endanger the safety of those lawfully on the premises." (Wayburn v Madison Land Ltd. Partnership, 282 AD2d 301, 303, citing Nallan v Helmsley-Spear, Inc., 50 NY2d at 519.)
Foreseeability includes what the landlord actually knew, as well as what it reasonably should have known. (See Sanchez v State of New York, 99 NY2d 247 [2002], supra.) "Foreseeability in this context has generally been equated with the degree to which a landlord has been apprised of the incidence of criminality within a particular building under his or her proprietorship." (Todorovich v Columbia Univ., 245 AD2d 45, 46 [1st Dept 1997], lv denied 92 NY2d 805 [1998].) Moreover, the type of {**3 Misc 3d at 468}safety measures a landlord is reasonably required to provide is "almost always a question of fact for the jury." (Wayburn v Madison Land Ltd. Partnership, 282 AD2d at 303; see Nallan v Helmsley-Spear, Inc., 50 NY2d at 520.)
In Nallan, the Court of Appeals stated that a landlord must anticipate the risk of harmful acts of third persons. It followed the description of a landowner's duty of care in the Restatement (Second) of Torts, which provides that a landlord must exercise reasonable care to discover that [*19]such harmful acts are being done or are likely to be done, give an adequate warning, or otherwise protect the visitors against it. (Nallan v Helmsley-Spear, Inc., supra at 519, quoting Restatement [Second] of Torts § 344.) Thus, foreseeability was cast in terms of past experiencethat is, that there is a likelihood of conduct by third parties which is likely to endanger the safety of visitors. (Id.)
In Jacqueline S. v City of New York (81 NY2d at 294), the Court of Appeals clarified that to establish a landlord's liability for the foreseeable danger from criminal activity, the operative proof did not have to be limited to crimes actually occurring in the specific building where the attack took place. It found that there was no requirement in either Nallan or Miller v State of New York, that to establish foreseeability the criminal activity be at the exact location where plaintiff was injured, or that it be of the same type of criminal conduct to which plaintiff was subjected. (Id. at 294.) In Jacqueline S., the plaintiff, a resident in one of several apartment buildings in a public housing complex, was abducted and raped by an assailant in her apartment building. (Id. at 291.) The plaintiff submitted proof of drug-related crimes in her building, and that drug addicts and vagrants gained access and hung around the corridors, stairways, and roof. She also submitted proof that the police had responded to numerous reports of rapes and robberies in the complex, and that the landlord was aware that the lobby doors and the doors to utility rooms on the roofs were not equipped with locks. (Id. at 291-292.) The Court held that this proof was enough to raise a triable issue as to foreseeability, even though there was no evidence that violent crimes had occurred previously in the building where the plaintiff was raped, because there was evidence of crime in the complex, and given the landlord's conceded failure "to supply even the most rudimentary securitye.g., locks for the entrancesit was error to grant summary judgment on the question of foreseeability." (Id. at 295; see also Wayburn v Madison Land Ltd. Partnership, 282 AD2d {**3 Misc 3d at 469}at 304 [other different crime put landlord on notice of the likelihood of third-party criminal conduct, so factual issue as to foreseeability].)
Therefore, contrary to the Port Authority's apparent argument, a landlord does not need to have had a past experience with the exact criminal activity, in the same place, and of the same type, before liability can be imposed for failing to take reasonable precautions to discover, warn, or protect. The inquiry focuses on what risks were reasonably to be perceived. Whether knowledge of prior activities is sufficient to make injuries foreseeable "must depend on the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question." (Jacqueline S. v City of New York, 81 NY2d at 295 [citations omitted].) Where ambient crime has infiltrated a landlord's premises, or where the landlord is otherwise on notice of a serious risk of such infiltration, the landlord's duty to protect arises. (See Todorovich v Columbia Univ., 245 AD2d at 46.)
The Port Authority's claim that this bombing was unforeseeable as a matter of law strains credulity. The Port Authority's duty is defined by what risks or dangers were and should reasonably have been anticipated by the Port Authority from having a high profile building, with a public parking garage under it, which permitted "unvetted" vehicles to enter and exit without encountering any barriers or surveillance. The Port Authority clearly perceived a risk since it created the OSP, and sought a report from it, and other outside consultants, regarding the risk of a terrorist attack on the WTC, and seeking recommendations for security measures to protect against the risk.
[*20]
The Port Authority's argument that ambient crime in the neighborhood is not enough, as a matter of law, to establish foreseeability, amounts to a contention that landlords can close their eyes to plainly perceived risks, and ignores plaintiffs' proof, which goes beyond simply ambient crime. Plaintiffs have presented proof, including the Port Authority's own OSP Report (defendant's exhibit Q), the reports from its outside security consultants (plaintiffs' exhibit 33; defendant's exhibit V; defendant's exhibit X), reports of bomb threats in the WTC itself (plaintiffs' exhibit 66), and in and around buildings in the downtown area from several years before (see plaintiffs' exhibit 58), and a bomb threat communicated by the FBI only a month before the bombing, which tends to establish, or at the least creates a triable issue, that the Port Authority had foreseen the risk, {**3 Misc 3d at 470}or that the risk was foreseeable. This evidence, at the least, put the Port Authority on notice of the risk of the infiltration of criminal activity in the WTC. (See Todorovich v Columbia Univ., supra.)
The predicted scenario, eerily accurate, in the Port Authority's security reports, of a vehicle bomb in the garage, and the evidence of bomb threats in the complex, are sufficiently similar in nature to the bombing to raise a triable issue as to foreseeability. (See Jacqueline S. v City of New York, 81 NY2d 288 [1993], supra; see also Flores v Dearborne Mgt., 297 AD2d 583 [1st Dept 2002] [prior crimes and ambient criminal activity in the vicinity known to defendants sufficient to raise triable issues]; cf. Jarosz v 3135 Johnson Tenant Owners Corp., 246 AD2d 488 [1st Dept 1998] [phone harassment, assault with broom, and petit larceny, not sufficiently similar to violent attack upon plaintiffs].) The fact that an explosive-laden vehicle had not previously been placed in the WTC garage does not, as the Port Authority appears to be arguing, make this event unforeseeable as a matter of law. The court is aware, as defendant strenuously argues, that there are no cases in which a landlord was subjected to liability for an unprecedented terrorist bombing in its building, particularly where the ambient crime was not necessarily in the immediate vicinity; however, the evidence of the Port Authority's actual notice of the risk of infiltration of this kind of terrorist activity cannot be ignored.
Landlords have been denied summary judgment in other cases on the issue of foreseeability even where there was no evidence of similar crimes in the building. For example, in Kahane v Marriott Hotel Corp. (249 AD2d 164 [1998], supra), the First Department held that there was a triable issue as to whether the defendant hotel should have reasonably foreseen the risk of harm to the decedent, such that it would have had a duty to provide more than minimal security. Decedent, a controversial speaker, was scheduled to speak at an affair at the hotel. On the day of the affair, the hotel received a call from a person who refused to identify himself, but who asked if the decedent would be speaking that night, and if metal detectors would be in place. (Id. at 165.) The hotel's employee who answered the call notified the group sponsoring the affair, and the hotel's security and catering departments, of the call. (Id.) The Court found that this evidence was enough to deny summary judgment on the issue of foreseeability. (Id.; see also Penchas v Hilton Hotels Corp., 198 AD2d 10 [1st Dept 1993] [fact issue as to foreseeability,{**3 Misc 3d at 471} where statement by defendant's employee indicating prior knowledge of potential danger of crime].)
In Gross v Empire State Bldg. Assoc. (NYLJ, Feb. 27, 2003, at 21, col 2 [Sup Ct, NY County, Lehner, J.]), the court found that violent criminal activity in the Empire State Building's stores and abutting sidewalks, combined with bomb threats to the building, which threats constituted criminal activity, raised a factual issue as to the foreseeability of a shooting on [*21]the observation deck. In that case, on February 23, 1997, a Palestinian, in this country on a visa, went to the observation deck and indiscriminately shot at tourists, killing one and injuring five others, before killing himself. (Id.) The plaintiffs argued that the landlords were negligent, inter alia, in not installing metal detectors and maintaining a program of inspection of bags. (Id.) The court found that the criminal activity noted above put the defendants on notice, warranting denial of defendants' summary judgment motion.
In addition, in Schaeffer v Vera Wang Bridal House, Ltd. (64 F Supp 2d 286 [SD NY 1999]), the court found that, while there was no evidence of prior crime in the bridal shop, evidence of the landlord's awareness of similar and of other types of crimes in the vicinity was enough to raise a factual issue for trial. (Id. at 293-295.) Plaintiffs in that case were shopping in the defendant's bridal shop, located in the Hotel Carlyle, when robbers, posing as shoppers, were let into the shop by defendant's employee, drew their guns and attempted to steal one of the plaintiff's rings. (Id. at 288-289.) Both of the plaintiffs were shot and seriously injured, and brought claims against the bridal shop for failure to provide adequate security. They presented proof of a number of crimes in the areas surrounding the shop and the hotel, including evidence of a series of highly publicized robberies on the Upper East Side over a three-year period, of which the shop employees were aware. (Id. at 290-291.) The court concluded that a reasonable jury could find on this evidence that the shop had reason to know that, even though there was no robbery on its premises in the past, there was a likelihood that its customers could be endangered by the criminal acts of others. (Id. at 294.)
Similarly, in cases involving crimes in jewelry stores in the diamond district in Manhattan, the courts have found the risk of criminal activity foreseeable without proof of a prior crime in the building, or even any particular proof of similar crime in the neighborhood. In Ratanee Jewelry v Art Jewelry Ctr. (253 AD2d 591 {**3 Misc 3d at 472}[1st Dept 1998]), the Court found that, based on the facts that the building tenants were all in the jewelry business, and the building was located in the diamond district, criminal intrusions were plainly foreseeable, requiring adequate security measures. (Id. at 592.) Also, in Rudel v National Jewelry Exch. Co. (213 AD2d 301 [1st Dept 1995]), the Court held that there was a triable issue on foreseeability, and whether the landlord's duty was breached, based only on the fact that the building was in the diamond district, and that there was only one unarmed security guard on the ground floor, without other security precautions. (See also Wayburn v Madison Land Ltd. Partnership, 282 AD2d at 303-304 [proof of other crimes elsewhere in the building, while not violent and not in the area in which plaintiff was attacked, was enough to raise a triable issue].)
Here, the OSP Report, and the reports of the Port Authority's outside security consultants, recognized that domestic terrorism was rising, the WTC was an attractive terrorist target, car bombs were becoming the terrorists' method of choice, and the underground parking garage was highly vulnerable to a terrorist attack. (Caram affidavit ¶ 12; defendant's exhibit P [Caram deposition at 46-47, 50]; plaintiffs' exhibit 21 [Caram deposition at 53-56]; defendant's exhibit Q at 000012, 000018 PASD; defendant's exhibit V at 000032, 000047, 000051 PASD.) Specifically, the Terrorist Planning Section, the predecessor to the OSP, in a report in 1984, warned that the WTC should be considered a prime target for domestic terrorism, and that the public parking lots were highly susceptible to car bombings. (Plaintiffs' exhibit 34 at 2, 11.) OSP's preliminary report states that the staff considered several attack scenarios, including a "[b]omb-laden truck attack." (Plaintiffs' exhibit 37.) It determined that a strategically placed van or truck could cause significant structural damage and many casualties. (Id. at 000106 PASD.) The Schnabolk Report, in 1985, informed the Port Authority that bombing attempts were probable, and warned that the WTC was "highly vulnerable through the parking lot." (Plaintiffs' exhibit 33 at 000155 PASD.)
The OSP's final report recited that it was aware that two thirds of domestic terror incidents in 1983-1984 occurred in the New York-New Jersey metropolitan area. (Defendant's exhibit Q at 000012-000015 PASD; see also plaintiffs' exhibit 58 [mem from E. O'Sullivan to P. Falvey, dated Aug. 29, 1985].) It warned that the car bomb was a weapon of choice for terrorists, and that the parking garage was a definite security risk. (Defendant's{**3 Misc 3d at 473} exhibit Q at 000018 PASD.) It specifically found that the underground parking garage presented "an enormous opportunity, at present, for terrorists to park an explosive-filled vehicle that could affect vulnerable areas." (Id. at 000006 PASD.) It clearly warned that the garage was vulnerable because access was "unimpeded" for someone to plant a "car bomb into the World Trade Center parking lot," which would affect all the important building's systems, which were all located around the parking areas. (Plaintiffs' exhibit 13 [O'Sullivan deposition at 316-317].) It predicted that a time bomb-laden vehicle could be driven into the garage, parked in the public parking area, the driver could exit into the WTC, and, at a predetermined time, the bomb would be exploded. (Defendant's exhibit Q at 000016 PASD.)
The Port Authority recognized that the threat of terrorism had increased after the end of the Gulf War in 1991. (Plaintiffs' exhibit 28 [letter from A. Preschle to V. Feliciano, Jr., dated May 24, 1991, at 000172 PASD].) Securacom, one of the Port Authority's outside consultants, warned the Port Authority of the increased threat following the Gulf War, and that the WTC was a likely terrorist target. (Plaintiffs' exhibit 25 [Orchid deposition at 25-29]; see also plaintiffs' exhibit 26 at 000055 PASD ["According to our sources within the intelligence community, in the aftermath of Mid-East events there will be a significant increase in international terrorist activities"].) Securacom specifically warned that "[b]ombs and the threat of their use continues to be the favored weapon of international terrorists" (id. at 000057 PASD), and advised the Port Authority that there was a potential that a vehicle bomb could be driven into the parking garage undetected. (Plaintiffs' exhibit 25 [Orchid deposition at 115-116].)
In addition to these reports, plaintiffs produced evidence that, just a month before the bombing, the FBI warned the Port Authority that a Middle Eastern group had threatened to blow up a major office building in New York. (Plaintiffs' exhibit 15 [Maikish deposition at 211-220]; Caram affidavit ¶ 31.) These predictions in security reports created at the Port Authority's request, apparently in recognition of some terrorist security risk, and the Port Authority's recognition of a continuing risk, create a triable issue as to whether the bombing was foreseeable.
The cases cited by the Port Authority are distinguishable on the facts. Notably, the Port Authority has not cited any cases in which {**3 Misc 3d at 474}the court has held that a landlord may disregard its own knowledge about the likelihood of criminal activity and the warnings of its own security experts. Todorovich v Columbia Univ. (245 AD2d 45 [1997], supra), relied upon by the Port Authority, in which the tenants were attacked in the building vestibule, is distinguishable, in that the Court specifically found that the defendant's building had an enviable security record, based on a report from the police department, and that the landlord had no actual notice of prior incidents in which ambient crime had infiltrated the building. (Id. at 47.) Also, in Anzalone v Pan-Am Equities (271 [*22]AD2d 307 [1st Dept 2000]), in which a tenant was assaulted outside her apartment, the Court found that, with proof of the functioning outer door lock on the vestibule to the building, a functioning intercom, and no proof of ambient criminality in the building or neighborhood, the landlord had discharged its duty. (Id. at 309.) Here, there is proof that the Port Authority was on notice of a serious risk of infiltration of terrorist activity in the parking garage, and the reasonableness or unreasonableness of the security measures it had taken is not being challenged by the Port Authority on this motion.
Therefore, summary judgment on the issue of foreseeability would be inappropriate on this record.